MURDOCK, Judge.
In July 2001, Edwin A. Benson (“the husband”) filed a complaint against Patricia Y. Benson (“the wife”), seeking a divorce on the ground of incompatibility of temperament and an equitable division of the parties’ real and personal property. The wife counterclaimed, seeking a divorce on the ground of adultery and an equitable division of the parties’ real and personal property, as well as “support.”
After an ore tenus proceeding, the Baldwin Circuit Court entered a judgment divorcing the parties on the grounds of incompatibility of temperament and irreconcilable differences. The divorce judgment awarded the wife, among other things, 10 acres of real property that she owned before the parties’ marriage (hereinafter referred to as “the Wilcox Road property”) (estimated fair market value of between $30,000 and $50,000);[1] the remaining balance (approximately $20,000) of the $26,000 she had withdrawn during the pendency of the divorce proceedings from the parties’ joint equity-line-of-credit account; a 2001 Buick vehicle, along with the indebtedness owed thereon;[2] a 1995 or 1996 Nissan pickup truck (estimated fair market value of $3,000); $2,500 in moving and temporary housing expenses; her personal effects; and all of the household furniture and household goods (except a piano, an armoire, and other musical instruments and equipment that were awarded to the husband).
The husband was awarded, among other things, the marital home (estimated fair market value of approximately $300,000, but subject to an outstanding equity line of credit in the approximate amount of $68,000); commercial real property that he owned before the parties’ marriage (hereinafter referred to as “the Fairhope property”) (estimated fair market value not included in the record, but subject to an outstanding mortgage indebtedness in the approximate amount of $136,000[3]); his stock in a family-owned business, Benson’s Appliance Center (“Benson’s), that he was part owner in before the parties’ marriage; a motor home (estimated fair market value of between $33,000 and $55,000);. a boat (estimated fair market value of $10,000, but subject to an outstanding indebtedness of $6,000 to $7,000); his personal effects; and the piano, armoire, and other musical instruments and equipment referred to above. The husband was also ordered to pay the wife’s attorney fees, to provide hospitalization insurance coverage for the wife, and to pay the wife $1,000 a month in rehabilitative alimony for a period of three years.
With regard to the rehabilitative alimony and insurance, the divorce judgment stated:
*1160 “4. The Court finds from the testimony presented that the ... [w]ife does not presently work, however, she has worked in the past and she is eligible for Social Security retirement income which she does not yet collect, but which will provide her in excess of $1,000 per month at age 65. She is currently 63 years of age. Therefore, the ... husband shall pay to the ... wife rehabilitative alimony at the rate of $1,000 per month for a period of three (3) years from the date of this judgment. The ... husband shall also be responsible [for providing] hospitalization insurance coverage for the ... wife comparable to that which she ... now has under his group health insurance plan.”
The divorce judgment also noted that “[t]he parties have no retirement funds, pension accounts, or investment accounts for division by the Court.”
The wife filed a motion to alter, amend, or vacate the judgment, or, in the alternative, for a new trial, alleging that the trial court had erred in failing to award her more alimony and in failing to award her a portion of the equity in the marital home. Her motion alleged, in part:
“2. The [husband] testified at the trial ... that at age 65, the [wife] would be eligible to draw over $1000 per month [in] [S]ocial [S]ecurity [retirement benefits]. Attached hereto is a certified copy of the [wife’s earnings history from the] Social Security Administration showing that at age 65+4 months, [the wife] will only be able to draw $679.00 per month.
[[Image here]]
“4. The husband and the wife acquired the marital residence during their marriage and amassed 100% of the equity therein during the marriage. None of the equity was amassed prior to the marriage. Under the [divorce judgment,] ... the husband gets approximately $200,000 in equity and the wife gets nothing. This is grossly unfair. The Court makes no arrangements for the wife, who is in her 60s and in bad health, to have any place to live whatsoever.”
Thereafter, the trial court entered, on the case action summary sheet, an amendment to the judgment:
“[The wife’s] Motion to Alter, Amend, or Vacate is granted. Paragraph 4 of the Order of 6-19-02 is amended to read ‘Therefore, the [husband] shall pay to the [wife] rehabilitative alimony at a rate of $1000 per month for a period of (five) 5 yrs from the date of this Judgment.’ All other provisions are to remain the same.”
The wife appeals.
The parties married in October 1991. In November 2000, the husband told the wife he did not love her anymore, and the parties subsequently separated in February 2001. The marriage was the third for the husband[4] and the second for the wife. (The husband’s first wife died and his second marriage ended in a divorce; the wife’s first marriage ended in a divorce.) The husband has two or three adult children from his first marriage and two teenage sons from his second marriage. The wife has two adult sons from her previous marriage. At the time of the trial in July 2002, the husband was 58 years old and the wife was 63 years old.
During the pendency of the divorce proceedings, the wife resided in the marital *1161 home, along with two of her grandchildren (a granddaughter and a grandson) that she had assumed physical custody of sometime during 1999. (The wife was awarded physical custody of those grandchildren in 2000.) The husband resided in the motor home, which he parked at a local trailer park. The husband paid all of the marital debts, except the electric utility bill for the marital home, which the wife paid. Additionally, the husband continued to pay the wife a “salary” of $500 every two weeks through Benson’s, his family-owned business. (The wife’s “salary” at Benson’s during the parties’ marriage is discussed in more detail below.)
The parties offered conflicting evidence regarding the cause of the breakdown of the marriage. The husband testified that the wife had been mean to. his children from one of his previous marriages. The wife denied that allegation. The husband also testified that the wife had failed to pay the household bills in a timely manner at a time when his maintaining a good credit rating was crucial for the continued operation of Benson’s. The wife admitted that she had paid some bills late in early 2000 because of the stress of having her grandchildren living with them. The husband testified that difficulties involving the grandchildren had contributed to the breakdown of the marriage as well.
The wife introduced a copy of a divorce judgment of one of her son’s (dated June 23, 2000); pursuant to the terms of an agreement between the wife’s son and his former wife that was incorporated into that judgment, the wife’s son and his former wife agreed that “physical custody [of their children] be placed with the their paternal grandparents, [the husband] and [the wife].”[5] (Neither the husband nor the wife was a party to that divorce proceeding.) The wife also introduced a “Limited Power of Attorney” (dated November 19, 1999), in which her son and his former wife granted the husband and the wife, pursuant to § 26-2A-7, Ala.Code 1975, authority with respect to the health, education, and maintenance of the granddaughter. The wife testified that it was her understanding that, pursuant to the terms of her son’s divorce judgment, the husband and she had been awarded joint physical custody of her grandchildren and that only a court could relieve them of that responsibility.
The husband denied that he had been awarded joint physical custody of the wife’s grandchildren. The husband testified that he had never seen a copy of the wife’s son’s divorce judgment and that he was “totally floored” by what was stated in that divorce judgment. The husband testified that he never signed any document agreeing to assume physical custody of the wife’s grandchildren and that he never intended to become the grandchildren’s permanent guardian. The husband- testified that the wife’s son and the wife’s son’s former wife executed the “Limited Power of Attorney” in order to permit the husband and the wife to enroll the granddaughter in school in their school district and to allow the husband to add the granddaughter as a dependent on his health insurance policy.
The wife testified that she became suspicious that the husband was having an affair with one of his employees, D.N., in May or June 2000. The wife introduced copies of telephone records showing that the husband and D.N. had called one an *1162 other. Some of the telephone calls occurred before the husband and the wife separated in February 2001, and some of the telephone calls occurred after the parties separated. When questioned about the telephone calls, the husband and D.N. testified that the majority of the telephone conversations were work related.
The husband claimed that the wife had telephoned D.N.’s husband and had mailed him letters regarding her suspicions that the husband and D.N. were having an affair; the wife denied those allegations. D.N. testified that she and her husband separated in June 2001 because of accusations and rumors of her having an affair with the husband. Both D.N. and the husband admitted that they began having sex in July 2001. The wife admitted that she visited D.N.’s husband at his home in July 2001 and that she left a piece of paper with D.N.’s address on it in his mailbox.[6]
The husband and three of his children are the stockholders of Benson’s. The husband runs the business. The husband testified that his annual salary from Benson’s is approximately $52,000 and that his “take-home” pay is $1,400 every two weeks. The record does not reflect the amount of taxes withheld from the husband’s paycheck, nor does it reflect what, if any, other amounts are withheld. The husband drives a 1996 Chevrolet Suburban sport-utility vehicle owned by Benson’s, and Benson’s provides health insurance coverage for the husband. The wife claimed that the husband’s salary from Benson’s could be higher than the husband testified that it was, taking into consideration the “salary” he had paid her in the past. The husband testified that because of competition from three retail chains entering the market area in 1997, 1998, and 2000, respectively, Benson’s had operated at a loss in 1999 and 2000. He further testified that Benson’s netted a profit of $14,000 in 2001 and that, as of the date of the trial (July 2002), it was showing an estimated profit for 2002 in the mid-$20,000s.
During the parties’ marriage, the husband paid the wife a “salary” through Benson’s; it is undisputed that the wife did not actually work at the business. The wife testified that the husband placed her on the payroll shortly after the parties were married; the husband testified that she was on the payroll for six to eight years. The husband testified that Benson’s had paid the wife a salary of $45,900 in 1998, $37,300 in 1997, and $28,400 in 1996; the husband also testified that, at the time of trial, he was paying the wife $500 every two weeks. The wife testified that the last federal income tax return the parties filed together reflected that she made $46,800.
The husband testified that he had placed the wife on the payroll of Benson’s to build up her Social Security retirement benefits. The husband testified that, “if something happened to him,” the wife would not re *1163 ceive any Social Security benefits based on his earnings because he had minor children and an ex-wife. The wife testified that the husband told her he was placing her on the payroll so that the parties could have additional income without it being considered part of the husband’s income for purposes of determining his child-support obligation for his teenage sons from his second marriage.[7] The wife testified that the husband stopped paying her a “salary” at the end of 2000 because, at that time, the husband and his ex-wife were in a “custody battle” and his ex-wife was seeking child support based on the husband’s and the wife’s combined salaries.
At trial, the husband testified that the wife would receive over $1,000 a month in Social Security retirement benefits (based on her previous earnings) if she waited until she was 65 to begin receiving those benefits. When asked, “What will the wife draw when she draws out the [Sjocial [Security?” the husband responded, “If she holds out to sixty-five something like fourteen hundred dollars a month. I think that is what the report said.”
Before the parties were married, the wife had worked as a convenience-store clerk, earning slightly more than minium wage. Before the parties were married, the wife had financial problems and had transferred the Wilcox Road property to her sister so that the wife’s creditors could not “confiscate” the property.[8] The husband testified that he had paid all of the wife’s debts in 1996 and that the Wilcox Road property had been transferred back to the wife. The wife testified that she takes medication for high blood pressure. She also testified that in the year before the trial she had had an operation on her shoulder and that her overall health had declined.
The husband and the wife jointly owned the marital home. The record does not include the date on which the home was purchased or the source of moneys used to purchase the home. The wife states in her brief on appeal that she did not contribute financially to the purchase of the marital home.' The husband testified that the marital home is worth $300,000.
In August 1991, the husband and the wife established a $75,000 equity line of credit on the marital home. The husband withdrew $49,000 from that equity-line-of-credit account, and, as previously stated, the wife withdrew the remaining $26,000 during the pendency of the divorce proceedings. The wife testified that when the parties established the equity line of credit, the husband told her that he was going to withdraw $35,000, and was going to repay the debt over a period of three and one-half years at a rate of $1,000 per month. The wife testified that she withdrew the $26,000 after discovering that the husband had withdrawn $49,000 — $14,000 more than he had told her he planned on withdrawing — and because he was not making the $1,000 monthly payments. The wife testified that she discussed the matter with her attorney before withdrawing the $26,000. At the time of the trial, the wife had spent approximately $6,000 of the $26,000, which she claimed she had used to pay medical expenses that had not been covered by insurance. The husband testified that he was making monthly payments on the indebtedness in the approximate amount of $1,100; he further testified that the wife’s withdrawal of the *1164 $26,000 had cause the monthly payment amount to double.
At trial, the husband asked the trial court to sell the marital home and to “divide the proceeds [of the sale] after the debts [the $75,000 equity line of credit and the $80,000 mortgage on his commercial property] are paid.” The wife requested that the court award her the marital home and order the husband to “continue to pay for it.” The wife explained that she needed the marital home to raise her grandchildren.
On appeal, the wife contends that the trial court erred because, she says, the amount of alimony awarded to her, as well as the length of time for which that alimony is to be paid, and the division of the property were against the great weight of the evidence, and, therefore, she contends, those awards constitute an abuse of the trial court’s discretion.
We begin by noting the appropriate standard of review in divorce proceedings. “Trial judges enjoy broad discretion in divorce cases, and their decisions are to be overturned on appeal only when they are ‘unsupported by the evidence or [are] otherwise palpably wrong.’ ” Ex parte Bland, 796 So.2d 340, 344 (Ala.2000) (quoting Ex parte Jackson, 567 So.2d 867, 868 (Ala.1990)). Also, when, as in this case, a trial court’s judgment is based on ore ten-us evidence, the judgment is presumed correct. Kennedy v. Kennedy, 743 So.2d 487 (Ala.Civ.App.1999). The presumption of correctness under the ore tenus rale “is based on the trial court’s unique position to observe the witnesses and to assess their demeanor and credibility.” Glazner v. Glazner, 807 So.2d 555, 559 (Ala.Civ.App.2001).
Matters such as alimony and property division are within the sound discretion of the trial court. Ex parte Drum-mond, 785 So.2d 358 (Ala.2000); Parrish v. Parrish, 617 So.2d 1036 (Ala.Civ.App.1993); Montgomery v. Montgomery, 519 So.2d 525 (Ala.Civ.App.1987). This court will not reverse a trial court’s division of marital property and its award of periodic alimony unless the trial court’s rulings are unsupported by the evidence and, thus, amount to an abuse of discretion. Ex parte Drummond, supra; Parrish, supra. “This court has defined rehabilitative alimony as ‘a sub-class of periodic alimony’ that allows a spouse ‘time to reestablish a self-supporting status.’ ” Fowler v. Fowler, 773 So.2d 491, 495 (Ala.Civ.App.2000) (quoting Jeffcoat v. Jeffcoat, 628 So.2d 741, 743 (Ala.Civ.App.1993), overruled on other grounds, Crenshaw v. Crenshaw, 816 So.2d 1046 (Ala.Civ.App.2001)).
In dividing property and awarding alimony, the trial court should consider “the earning abilities of the parties; the future prospects of the parties; their ages and health; the duration of the marriage; [the parties’] station in life; the marital properties and their sources, values, and types; and the conduct of the parties in relation to the cause of the divorce.” Russell v. Russell, 777 So.2d 731, 733 (Ala.Civ.App.2000). Also, the trial court is not required to make an equal division of the marital property, but it must make an equitable division based upon the particular facts and circumstances of the case. Golden v. Golden, 681 So.2d 605 (Ala.Civ.App.1996); Brewer v. Brewer, 695 So.2d 1 (Ala.Civ.App.1996). “A property division that favors one party over another does not necessarily indicate an abuse of discretion.” Fell v. Fell, 869 So.2d 486, 496 (Ala.Civ.App.2003) (citing Dobbs v. Dobbs, 534 So.2d 621 (Ala.Civ.App.1988)).
At the outset, we note that the trial court’s finding in the original divorce judgment that the wife’s “Social Security retirement income ... will provide her in *1165 excess of $1,000 per month at age 65” is erroneous. Although the husband testified at the trial that he believed the last “report” he had seen (presumably an earnings-history statement for the wife from the Social Security Administration) stated that the wife would receive approximately $1,400 per month if she “[held] out to sixty-five something,” the wife introduced documentary evidence to the contrary— e.g., the statement of her earnings history from the Social Security Administration, dated January 18, 2000, that estimated the wife’s Social Security retirement benefits at “age 65 plus 4 months” to be $730 per month.
Although the trial court did not alter the specific finding — namely, that the wife’s “Social Security retirement income ... will provide her in excess of $1,000 per month at age 65” — in its amended judgment, we presume that the trial court took the wife’s arguments into consideration when it adjusted the length of time the wife would receive rehabilitative alimony from three years to five years.[9] Where a trial court does not make specific findings of fact, this court will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous. Transamerica Commercial Fin. Corp. v. Am-South Bank, N.A., 608 So.2d 375 (Ala.1992).
The wife also argues that, based on the general factors to be considered in awarding periodic alimony and in dividing marital property, she still should have received periodic alimony. While the wife’s argument is not entirely unpersuasive, we cannot say that it was an abuse of discretion under the circumstances presented for the trial court to award the wife only rehabilitative alimony. We note, however, that the total amount of the alimony awarded, including the lack of periodic alimony, provides a context for our consideration of the trial court’s failure to award the wife a portion of the equity in the marital home.
The marital home is the largest asset owned by the parties that was acquired during their marriage. The husband testified that the marital home is worth $300,000. We note that the marital home was acquired early in the marriage and that all of the equity in the marital home was likewise acquired during the marriage. During the parties’ marriage, the home was damaged by a hurricane. The husband refinanced the mortgage he owed on his commercial property and used $80,000 of the money obtained from the refinancing to make the repairs to the marital home that were caused by the hurricane. Even if we deduct that $80,000 from the parties’ equity in the marital home, the parties’ equity in the marital home is still $220,000. If we then subtract the $75,000 equity-line-of-credit indebtedness (of which the husband received $49,000 and the wife received $26,000) from the $220,000, there remains a net equity of $145,000.
*1166 The parties were married over nine years before they separated'. At.the time of the trial, the wife was 63 years old and was in fair health, and the husband was 58 years old. The husband runs his family-owned business, Benson’s, and he earned over $90,000 a year if the income he allocated to the wife during the last several years is included in his income. The wife had worked as a convenience-store clerk before the parties’ marriage. Although the trial court granted the divorce on the grounds of incompatibility of temperament and irreconcilable differences, there was considerable testimony indicating that the husband’s relationship with another woman had contributed to the breakup of the marriage.
In addition to the rehabilitative alimony of $1,000 per month for a period of 60 months, the wife was awarded the Wilcox Road property that she had received in her previous divorce; the remaining $20,000 of the $26,000 she had already withdrawn from'the equity line of credit; a 2001 Buick vehicle, along with the indebtedness owed thereon; a 1995 or Í996 Nissan pickup truck; $2,500 in moving and temporary housing expenses; her persona} effects; and all of the household furniture and household goods (except a piano, an armoire, and other musical instruments and equipment that were awarded to the husband).
The husband was awarded the marital home, along with the outstanding indebtedness thereon; the Fairhope property he owned before the parties’ marriage; his stock in Benson’s, the family-owned business that he was part owner in before the parties’ marriage; a motor home; a Bay-liner boat, along with the outstanding indebtedness owed thereon; his personal effects; and' the piano, armoire, and other musical instruments and equipment referred to above. ■
Taking into consideration the earning abilities of the parties; the future prospects of the parties; their ages and health; the duration of their marriage; the parties’ stations in life; the marital properties and their sources, values, and types; and the conduct of the parties in relation to the breakup , of the marriage, we conclude that the trial court’s division of the marital property was not equitable and that the trial court abused its discretion by not awarding the wife a portion of the equity in the marital home. Accordingly, we reverse that portion of the trial court’s judgment dividing the parties’ marital property, and we remand the cause to the trial court for the entry of a judgment consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
THOMPSON and PITTMAN, JJ., concur.
YATES, P.J.’ concurs in the result.
CRAWLEY, J., dissents.

. Although the husband stated during the trial that there was a house located on the Wilcox Road property, it appears that there is not a house located on that property.

. The court also required the wife to be responsible for paying for the insurance on this vehicle. The record indicates that the payment on the indebtedness owed on this vehicle was approximately $500 to $600 per month; however, the other terms of the note evidencing the indebtedness owed on this ve-hide and the estimated fair market value of the vehicle are not included in the record.

. The parties used $80,000 of this amount to repair the marital home after a hurricane. Additionally, the commercial property produced rental income in the approximate amount of $2,800 a month. The husband testified that he did not make any money off this property — that the $2,800 monthly rental income just "pays the payment.”

. Although the wife made a statement during a conversation she recorded between herself and the husband indicating that the husband might have been married three times before he married the wife, all other evidence in the record indicates that the husband had been married twice.

. The agreement further states that the wife's son "shall pay child support ... in accordance with the Rule 32 child support guidelines.” The wife testified that her son paid some child support, "depending] on how much he was making,” and that the son’s former wife paid minimal child support.

. The record indicates that neither party behaved in an exemplary manner during the divorce proceedings. One of the husband's employees testified that she observed the wife going through the husband’s desk drawers at Benson's (apparently while the husband was not present). That same employee also testified that the wife told her that she had broken into D.N.’s house. The wife admitted that she had walked around D.N.'s house, but she denied that she had broken into it.
The wife recorded a conversation she had with the husband wherein the husband threatened to have one of the wife's sons, who was an employee at Benson's, arrested if the wife did not ''back-off” her position regarding property-settlement negotiations during the pendency of the divorce proceedings. The husband claimed that he was merely attempting to settle the parties' divorce. Thereafter, the husband pressed charges against the wife's son for stealing from Benson’s, and the wife's son was arrested.

. The record indicates that the husband was paying approximately $520 a month in child support.

. The husband claimed that the wife had financial problems after she was caught stealing from a former employer; the wife denied that allegation.

. The husband states in his brief on appeal that the trial court heard oral arguments on the wife's postjudgment motion but that the hearing was not transcribed and, therefore, was not included in the record. (The husband does not claim to have presented any additional evidence at that hearing.) The husband states that he pointed out at that-hearing that the wife would be entitled to a higher amount of Social Security benefits, based on the husband's earnings and assuming that she does not remarry and further assuming that she begins receiving those benefits on February 6, 2006, at which time the husband will be 62 years old and the wife will be 67 years old. The husband argues that the trial court extended his rehabilitative-alimony obligation an additional two years so that the wife could wait until she reached age 67 to begin receiving Social Security benefits— thereby basing her benefits on the husband's earnings instead of solely on her earnings.