[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1266 
On March 29, 2001, the circuit court divorced Laurie McClelland ("the wife") and Bryan A. McClelland ("the husband"). The court awarded custody of the parties' two children to the husband, divided the marital property, and ordered the husband to pay the wife $1,200 per month in periodic alimony. The wife appeals, arguing that the child-custody award was clearly erroneous and that the property-division and periodic alimony awards were inequitable. She also argues that the trial court erred by failing to appoint a guardian ad litem to represent the children, by failing to award her unpaid pendente lite support, and by failing to award her an attorney fee.
The parties began dating in 1986 while the wife was the operations manager for Advanced Medical Computer Systems and the husband, a physician in Canada, was in the midst of divorce proceedings. In the summer of 1988, the parties, who were then living together, moved to Birmingham, Alabama, with 4 children: the husband's 2 children by his previous marriage — a 5-year-old boy and a 3-year-old girl; and the husband's 11-year-old nephew and 8-year-old niece. The parties married in December 1988. Two children were born of the marriage: sons who were 11 years old and 8 years old at the time of trial. The husband's nephew and niece lived with the parties for three years; they returned to Canada in 1992.
The husband is 49 years old; he has been a family practice physician for 23 years. He is the sole shareholder in Alabama Family Medicine, P.C., a subchapter-S corporation. His annual income in the seven years preceding the divorce ranged between $120,000 and $187,000. At trial, he estimated that his current income is $12,000 per month. The wife is 44 years old; she has a diploma from a Canadian high school and she has taken some college courses. Aside from two brief periods of employment — as a part-time receptionist in the husband's medical office and as a clerk in a Hallmark greeting card store — the wife has not been employed outside the home since the parties moved to Birmingham. During the parties' 12-year marriage, the wife had most of the domestic responsibilities; she was the primary caregiver for the parties' two children, the husband's two children by a prior marriage, and for three years, the husband's nephew and niece. The wife is a gourmet cook. She has been involved in the children's school activities as a room mother and reading volunteer, and she has participated in their scouting and athletic activities.
The evidence indicates that the parties' marital difficulties were precipitated by their constant disagreements (and frequently violent confrontations) over financial matters. The husband presented evidence tending to show that when the wife was handling the family finances, the checking account was routinely overdrawn, *Page 1267 
sometimes by as much as $600 per month. The husband testified that in 1998, the parties agreed that the wife would write out the checks for the household bills, and that he would then sign them. At the end of the year, the husband discovered that a number of creditors for whom he had signed checks had not been paid, yet the funds had been removed from the checking account. The husband testified that he signed one check in the amount of $6,000 for his son's tuition at Birmingham-Southern College, but that the college notified him that it had never received payment.
The parties had an equity line of credit on the marital home from which, the husband claimed, the wife obtained $140,000 by telephone transfers; he testified that he had no idea how that money had been spent. The husband testified that when the wife was employed in his office, she handled the accounts payable. He said that the wife failed to pay some of the office bills and failed to make any contributions to the husband's retirement account, despite the parties' agreement that 10 percent of the husband's monthly income would be deposited into the account. After the husband discovered that the wife had signed his name to a check written to herself on the medical-practice account, the husband restricted her access to the office accounts.
The wife denied any wrongdoing in connection with the husband's office accounts, but she conceded that the parties' personal checking account was frequently overdrawn. She attributed that state of affairs to the fact that the husband was not making enough money, that both parties were "terrible" money managers, and that neither party could adhere to a budget. The evidence indicates that the parties entertained frequently and spent large amounts on household furnishings and decorative items for two homes — their primary residence in the Cahaba Heights section of Birmingham, and a house on Logan Martin Lake in St. Clair County. The parties acquired several pieces of expensive artwork, including one painting valued at $30,000. They owned two boats, a canoe, and a hang glider.
The wife filed the complaint for divorce in August 1999, after the husband had transferred most of the funds from the parties' joint checking account to a separate account in his name only, and had told the wife that there was "someone significant" in his life. The husband's paramour was the first witness to testify at the trial. She said that she had known the husband for years but stated that they had not been sexually intimate until the parties had separated and the wife had filed for a divorce. The trial court made no express finding of fault concerning either party.
 I. The Child-Custody Award
The wife argues that the trial court erred by awarding custody of the parties' two children to the husband because, she claims, the court apparently disregarded the Custody and Domestic or Family Abuse Act, see
§ 30-3-130 et seq., Ala. Code 1975. She also claims that the court abused its discretion by failing to appoint a guardian ad litem for the children once it became aware that domestic violence was an issue in the case.
At trial, each party accused the other of perpetrating domestic violence upon the other and upon a child or children in the household. The wife testified that the husband had choked her, pushed her, spat upon her, poured a glass of wine on her head, and forced her to sleep on the floor. She also presented evidence indicating that the husband had picked up the parties' eight-year-old son by the neck, had thrown him on the sofa, and had left marks on him. *Page 1268 
The husband testified that the wife had hit him, bitten him, and injured his daughter and son. He said that the wife had injured the hand of one of the parties' sons by forcefully closing a drawer on the boy's hand. The husband described the wife as "physically dangerous and emotionally manipulative." He presented evidence indicating that the wife had slapped his daughter in the face and had pushed his daughter's head into a counter, causing an injury to the child's forehead that necessitated 12 sutures to close. The wife admitted that she had twice slapped the daughter across the face to discipline her, but she maintained that the forehead injury was the daughter's fault. The wife testified that the husband's daughter had attacked her while she was driving and the daughter was a passenger in the wife's car. The wife introduced a photograph showing her injuries; the photograph depicts a black eye and extensive bruising on the wife's upper body. The husband characterized his daughter's behavior on the occasion described by the wife as "out of control." He said that he had taken his daughter for counseling and had kept the daughter and the wife apart for several weeks after the incident.
The husband testified that the parties' older son had told him that he (the son) was afraid of the wife. The older son testified in camera but, at the end of his testimony, the trial court disqualified the witness, finding that the boy's testimony had been influenced by the mother. The trial court's judgment specifically states:
 "This court heard testimony from both parties that indicated socially unacceptable conduct on both of their parts and brought into the case those issues contemplated by Fesmire [v. Fesmire, 738 So.2d 1284
(Ala.Civ.App. 1999)]. The Court finds that some of the evidence is credible and some of it is not. The Court also notes that the parties have already been to counseling regarding this type of conduct and sees no reason to send them back to counseling. The Court, in making its custodial decision, has taken into consideration all of those issues encompassed in Fesmire and the statutes dealt with in Fesmire."
Fesmire v. Fesmire, 738 So.2d 1284 (Ala.Civ.App. 1999), which had required the trial court to make an express finding on the record as to whether domestic abuse had occurred and, if so, which party was the perpetrator, was overruled in Ex parte Fann, 810 So.2d 631 (Ala. 2001). InFann, our supreme court reiterated the following well-established principles of Alabama law:
 "`[W]here a trial court does not make specific findings of fact concerning an issue, this Court will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.' Moreover, `[b]ecause the trial court has the advantage of observing the witnesses' demeanor and has a superior opportunity to assess their credibility, this Court cannot alter the trial court's judgment unless it is so unsupported by the evidence as to be clearly and palpably wrong.'"
810 So.2d at 636 (citations omitted). The statements quoted above from the trial court's judgment demonstrate that the court did not disregard the relevant statutes dealing with domestic and family abuse. Instead, the statements indicate that the trial court made a custody decision based, in part, upon credibility determinations as to the allegations of domestic abuse. This court assumes that the trial court found either that the acts alleged by the wife did not occur, that the husband's acts did not constitute domestic abuse, or that both parties were guilty of abusive behavior. See J.H.F. v. P.S.F., *Page 1269 835 So.2d 1024, 1029 (Ala.Civ.App. 2002). The record demonstrates that any of the foregoing findings would be supported by the evidence, depending on whose testimony the trial court determined was worthy of belief.
The wife cites no authority, aside from a dissenting opinion in Kentv. Green, 701 So.2d 4 (Ala.Civ.App. 1996), for her argument that the trial court abused its discretion by failing to appoint a guardian ad litem for the children. The dissent in Kent obviously does not state the currently prevailing law in Alabama. Moreover, Kent involved undisputed proof of family violence much more serious than the abuse alleged in the present case. We, therefore, find no abuse of discretion in the trial court's failure to appoint a guardian ad litem for the children.
In an initial award of custody, the trial court must decide the custody issue based on the best-interest-of-the-children standard. See Ex parteCouch, 521 So.2d 987(Ala. 1988). The parties stand on equal footing; neither party enjoys a favorable presumption. See Smith v. Smith,727 So.2d 113 (Ala.Civ.App. 1998).
 "When this Court reviews a trial court's child-custody determination that was based upon evidence presented ore tenus, we presume the trial court's decision is correct: `"A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong. . . ."' Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994), quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App. 1993) (citations omitted). This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. `In child custody cases especially, the perception of an attentive trial judge is of great importance.' Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ.App. 1981). In regard to custody determinations, this Court has also stated: `It is also well established that in the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.' Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala. 1996)."
Ex parte Fann, 810 So.2d at 633.
The wife has been a stay-at-home mother and the primary caregiver for the children. Nevertheless, the evidence indicates that, although the husband has a demanding career, he has not been an absentee father but has been involved in the children's lives and activities. The husband testified that, because he has his own medical practice, his hours are flexible and he can arrange to be home when the children need him. The record demonstrates that either party would be a suitable custodian for the children. Therefore, we conclude that the trial court's custody determination is due to be affirmed.
 II. The Unpaid Pendente Lite Support
On November 24, 1999, the trial court ordered the husband to pay the wife $3,500 per month, pendente lite, for the support and maintenance of herself and the children. At trial, the husband admitted that he had not paid the full amount ordered. The wife testified that the husband was in arrears in pendente lite support in the amount of $26,030. The trial court's judgment states: *Page 1270 
 "The Court notes that there is some claim to unpaid child support and/or alimony pursuant to this Court's Pendente Lite Order. However, there was no conclusive evidence presented at trial as to what this exact amount may have been. Therefore, the Court is unable to reach a decision regarding this issue."
The wife argues that the trial court erred by failing to enter judgment for her for unpaid and past due pendente lite support. We agree. SeeSlater v. Slater, 587 So.2d 376(Ala.Civ.App. 1991). In Slater, as in this case, the husband was ordered to pay pendente lite support, "there was uncontroverted testimony that the husband had not made all of these payments," and the wife testified that the arrearage amounted to a sum certain. 587 So.2d at 380. Citing Ex parte Morgan, 440 So.2d 1069 (Ala. 1983), for the well-settled proposition that "past-due installments for such support create a final money judgment," this court remanded the matter to the trial court "so that it may calculate the arrearage and enter a monetary judgment for the amount due the wife."587 So.2d at 380. We direct the trial court to make such a calculation in this case and to enter a judgment for the wife.
 III. The Periodic-Alimony and Property-Division Awards
The parties own two parcels of real estate: the marital residence in Cahaba Heights, purchased in 1988 for $240,000 and encumbered by a home-equity mortgage of $304,000; and a lake house, purchased in 1996 for $180,000, that is unencumbered. When the parties moved into the Cahaba Heights house, construction was not yet complete and the husband finished the house himself. Inside, he hung sheetrock, painted, wallpapered, installed tile in three rooms, added a kitchen island, and did the plumbing in all of the bathrooms. Outside, he cut down 64 trees, built fieldstone walls, stairs, and a swimming-pool surround, and constructed decks and an arbor.
Pursuant to a pendente lite order, both houses were, at the time of trial, listed for sale. The husband testified that the Cahaba Heights house was listed at $380,000, but the realtor had suggested that the parties reduce the asking price to $270,000. Up to and including the time of trial, the wife had not consented to reducing the price. The husband presented evidence indicating that the house needed $40,000 to $45,000 worth of repairs before it could be sold, but that the wife had refused to allow him or a contractor access to the house to make the repairs. The lake house was, at the time of trial, listed for sale at $280,000. The final judgment of divorce ordered that both parcels of real property be sold, that the proceeds be applied to the indebtedness on the marital home, and that the balance, if any, be divided equally between the parties.
Each party was awarded the vehicle in his or her possession. The wife was awarded a 1998 Oldsmobile Achieva, which the husband had purchased for her in October 1999, for $16,000 and for which the monthly payments are between $200 and $250. The wife was ordered to make the payments on this vehicle; the record does not reveal the outstanding balance on the vehicle. The husband was awarded a 1997 Cadillac DeVille with a $10,000 indebtedness for which the husband pays $1,000 per month. The husband was awarded two boats, a canoe, and a hang glider.
The husband was awarded his A.G. Edwards individual retirement account valued at $234,846.79. The evidence indicates that, with the exception of a $6,000 contribution to the account made in 1991, all of the contributions to this retirement account were made before the marriage and *Page 1271 
that no withdrawals were made during the marriage. The wife does not contend that she should have been awarded a portion of the husband's A.G. Edwards retirement account. The trial court awarded each of the parties one-half of the husband's 401(k) account, which was established and funded during the parties' marriage, and which had, at the time of trial, a balance of $30,648.31. The husband was awarded his Alexander Hamilton universal insurance account, from which he was paying his son's college tuition; that account had a balance of $9,041. The husband was awarded his stock in Alabama Family Medicine, P.C.
Each party was awarded his or her clothing, personal effects, jewelry, and various items of furniture, furnishings, equipment and artwork. The wife was ordered to be responsible for all the debts she had incurred in her name, including approximately $1,500 of credit-card indebtedness and a $19,000 loan from her parents. The husband was ordered to be responsible for a $20,000 federal tax liability. Each party was made responsible for his or her own attorney fee.
"It is well settled that trial judges enjoy broad discretion in fashioning divorce judgments." Ex parte Bland, 796 So.2d 340, 343 (Ala. 2000).
 "`In reviewing the trial court's judgment in a divorce case presented ore tenus, we will presume the judgment to be correct until it is shown to be plainly and palpably wrong or unjust. Brannon v. Brannon, 477 So.2d 445 (Ala.Civ.App. 1985).'"
Id. (quoting Ex parte Jackson, 567 So.2d 867, 868 (Ala. 1990)). Issues concerning alimony and the division of marital property rest within the trial court's discretion, and rulings on those matters will not be disturbed in the absence of a plain and palpable abuse of discretion.Welch v. Welch, 636 So.2d 464 (Ala.Civ.App. 1994). Matters of alimony and property division are interrelated, and a reviewing court must consider the entire judgment in determining whether the trial court abused its discretion on either issue. Willing v. Willing, 655 So.2d 1064
(Ala.Civ.App. 1995).
 "Each case is decided on its own peculiar facts and circumstances. Criteria which should be considered by the trial court when awarding alimony and dividing property include the length of the parties' marriage, their ages, health, station in life, and future prospects; the source, value, and type of property owned; the standard of living to which the parties have become accustomed during the marriage and the potential for maintaining that standard; and, in appropriate situations, the conduct of the parties with reference to the cause of divorce."
Currie v. Currie, 550 So.2d 423, 425 (Ala.Civ.App. 1989).
Applying the foregoing criteria, we conclude that the parties, who were married for 12 years, are still relatively young and in good health. The future employment prospects of the wife, who has had little work experience and who has few marketable skills, are not particularly bright, especially when compared with those of the husband who has many productive years in which to practice medicine. The wife may not, without further training, be able to find employment that pays her more than the minimum wage. In the immediate future, she cannot expect to enjoy a standard of living like the one to which she has been accustomed for the past 12 years. However, assuming that the trial court believed the evidence presented by the husband — that the wife was guilty of massive overspending, financially irresponsible conduct, and deception, if not forgery and theft — *Page 1272 
then it is apparent that the standard of living the wife enjoyed during the marriage was an artificial one that had no relation to the parties' actual income. The trial court could have concluded that the wife's refusal to live within the parties' means affected both the family's financial and emotional stability. It could have determined that because of the wife's financial misconduct, the parties had more debt than equity subject to division upon a divorce. Accordingly, the trial court could have decided that the wife should bear the consequences of her misconduct in any allocation of property and debt upon a dissolution of the marriage.
The trial court's division of the marital property does not leave the wife destitute, however. Even if the lake house, which is listed for $280,000, sells for only $200,000, and the Cahaba Heights house sells for only $240,000, the wife will realize $68,000 after the proceeds of those sales are used to pay off the home-equity mortgage on the Cahaba Heights residence. At trial, the wife testified that she would like to pursue further educational opportunities. With $68,000 in liquid assets, she will be able to make a down payment on a home or enroll in some kind of training or educational preparation, as well as establish her independent-living and budgeting skills. The wife's previous employment as the operations manager for a medical computer systems company and her experience in a physician's office may be qualifications that she can update with minimal expense.
We conclude that the trial court's division of the marital property, its allocation of the debts, and its award of periodic alimony were not inequitable. See Ex parte Wallace, 795 So.2d 719 (Ala. 2000).
 III. Attorney Fee
The wife argues that the trial court abused its discretion by failing to order the husband to pay her attorney fee. The wife's lawyer testified that, before the trial, she had expended 161 hours, billed at $150 per hour, on the case ($24,150). She also had expenses of $854.40. The wife had paid her lawyer an $8,000 retainer and had given her two rings. The wife testified that during the year leading up to the trial, she had borrowed $19,000 from her parents in Canada. She used $8,000 of that amount to pay the retainer; she used the remainder for living expenses.
It is well settled that the award of attorney fees in a divorce action is a matter within the sound discretion of the trial court. See Slaterv. Slater, 587 So.2d 376 (Ala.Civ.App. 1991); Holmes v. Holmes,487 So.2d 950 (Ala.Civ.App. 1986). In determining whether to award an attorney fee, the trial court should consider the conduct of the parties, the financial circumstances of the parties, and the outcome of the litigation. Murphree v. Murphree, 579 So.2d 634, 637 (Ala.Civ.App. 1991). Considering the culpable conduct of the wife and the outcome of the litigation, we cannot say that the trial court abused its discretion in failing to assess an attorney fee against the husband.
 IV. Conclusion
Those portions of the judgment awarding custody of the parties' two children to the husband, dividing the marital property, awarding the wife periodic alimony, and ordering the wife to be responsible for paying her own attorney fee are affirmed. That portion of the judgment declining to enter a judgment for the wife for the husband's undisputed arrearage in pendente lite support is reversed. The trial court is instructed to calculate the arrearage in pendente lite support and to enter a judgment for the wife concerning unpaid pendente lite support. *Page 1273 
Both parties' requests for an attorney fee on appeal are denied.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
PITTMAN, J., concurs.
YATES, P.J., and THOMPSON, J., concur in the result.