987 So.2d 606 (2008)
Nancy H. GIARDINA
v.
Henry S. GIARDINA.
2060185.
Court of Civil Appeals of Alabama.
January 18, 2008.
*608 Thomas H. Nolan, Jr., of Wright, Green, P.C., Mobile, for appellant.
James G. Curenton, Jr., Fairhope, for appellee.

On Application for Rehearing
THOMAS, Judge.
The opinion issued by this court on October 5, 2007, is withdrawn, and the following opinion is substituted therefor. Nancy H. Giardina ("the mother") and Henry S. Giardina ("the father") were divorced by the Baldwin Circuit Court on August 4, 2006. The divorce judgment, among other things, awarded sole physical custody of the parties' two sons, who were 11 and 7 years of age at the time of trial, to the father; granted the mother standard visitation rights and ordered her to pay $200 per month in child support; ordered the father to pay the mother rehabilitative alimony in the amount of $1,500 per month for 3 years; and required that, if the mother successfully completed an educational or vocational course of study, the father reimburse her up to $5,000 within 120 days of her receiving a certificate or diploma.
The judgment granted the mother possession of the marital residence for one month following the date of the judgment and awarded the father exclusive possession of the residence thereafter. The judgment further provided that the parties share the cost of having the residence appraised and that the father pay the mother half the equity in the residence. The judgment made each party responsible for the debts he or she had incurred since the date of the parties' separation, awarded each party his or her own personal property, and required the mother to "execute any documents necessary to convey any claim to any property owned by the [father], including any business interest."
The judgment further provides:
"The [father] is awarded what the court has marked as Exhibit B, a list of his personal property and is attached to and incorporated by reference herein. The [mother] shall leave all of the property in the house when she surrenders possession, after having a reasonable time to find other lodging. The [mother] is awarded all of her property including the restored Cutlass automobile."
The mother appeals, arguing that the trial court erred by awarding sole physical custody of the parties' two sons to the father, by awarding her inadequate rehabilitative alimony, by failing to reserve jurisdiction to award her permanent periodic alimony, and by making an inequitable division of the parties' marital assets and liabilities. She also asserts that the admission of certain evidence and an omission by her attorney entitle her to a new trial.

Factual and Procedural Background
At the time of trial, the father was 59 years old and the mother was 40 years old. This was the father's second and the mother's first marriage. The father had completed three years of college but had dropped out in his senior year and joined the Marines. In 1975, when he was 28 years old, the father pleaded guilty and was convicted of two criminal offenses  buying and receiving stolen automobile parts and attempted bribery of a public official, the latter offense stemming from the father's attempt to "fix" a traffic ticket. The father also has two convictions arising *609 out of altercations with the mother, a 2002 conviction for a domestic-violence offense and a 2005 conviction for making harassing communications.
The mother dropped out of high school in the 10th grade and later obtained a G.E.D. Before the marriage, the mother sold clothing at retail and worked as a waitress in bars and restaurants. The parties met at a bar in Mobile and lived together for 18 months before the mother became pregnant. The parties married on July 1, 1994. During the marriage, the father operated an Internet-based multilevel marketing business and invested in real-estate ventures. The mother did not work outside the home during the marriage. Both parties are in good health.
In 1997, the parties separated, the mother filed a complaint for a divorce, and the mother had a brief affair with an old boyfriend, after which the parties reconciled, the mother dismissed her divorce complaint, and the parties participated in marital counseling. The parties lived together until March 29, 2004, when they separated for the final time. On April 2, 2004, the mother filed a complaint for a divorce and a motion seeking pendente lite relief. The trial court entered an ex parte order granting the mother, among other things, temporary exclusive possession of the marital residence, pendente lite custody of the children, and pendente lite support from the father; requiring that the father's visitation with the children be supervised; and prohibiting the parties from wasting or transferring marital assets. The father answered the mother's complaint, counterclaimed for a divorce, and moved the court to order a mental examination of the mother. On June 1, 2004, the mother filed a protection-from-abuse complaint against the father. On July 28, 2004, the mother filed a second protection-from-abuse complaint against the father.[1] The parties filed a number of motions seeking to hold the other in contempt with regard to issues concerning visitation, support, and the dissipation of marital assets.
On June 25, 2005, the parties reached an agreement with respect to temporary issues. That agreement provided, among other things, that the father would have regular unsupervised visitation with the children, that the father would pay temporary support in the amount of $3,250 per month, and that Dr. Catalina Arata would conduct a custodial evaluation of the parties and their children. The agreement, however, did not end the barrage of contempt motions and other pleadings seeking pretrial relief. The mother filed contempt motions in August and September 2005, *610 alleging that the father had violated the trial court's visitation and support orders by failing to return the children at the appointed times, by failing to give the mother notice of taking the children out of state, by disparaging the mother to the children, by damaging the garage of the marital residence and threatening the mother, and by failing to pay the full amount of temporary support. In early September 2005 the father filed a motion seeking to have the mother held in contempt for interfering with his visitation rights and for failing to allow him to transport the children to extracurricular activities. On September 30, 2005, the father filed an instanter motion for temporary custody of the children and possession of the marital residence, alleging that the mother had allowed an unrelated male visitor to spend the night at the marital residence with the children present.
At ore tenus proceedings on April 7, 2006, and May 2, 2006, the following evidence was presented. Dr. Catalina Arata, a licensed clinical psychologist, testified that she had interviewed all four family members, administered psychological tests, and reviewed records relating to the family. She stated that both parents had a history of significant problems with anger management that resulted in a volatile relationship characterized by verbal abuse and occasional outbursts involving some physical aggression. She said that both parents had used the children as "pawns" during the two-year period that the parties' divorce action had been pending, but she thought that the father had been more aggressive in his efforts to alienate the children from the mother. That opinion, combined with the fact that the mother had always been the children's primary caregiver, led Dr. Arata to conclude that the mother was the more fit custodial parent for the children.
The father acknowledged that he had pleaded guilty to a prior domestic-violence offense against the mother, but, he said, he did not understand the implications of his plea. He stated that he had agreed to plead guilty because the district attorney had told him that the parties would be required to attend anger-management classes and he wanted the mother to participate in those sessions. The guilty plea was based on an incident that occurred in December 2001, when the father, who had just returned from a cross-country business trip, was reading a book to the parties' then three-year-old son. The father said that the mother had insisted that it was the child's bedtime and had abruptly turned off the light while the father was reading to the child. The father turned the light back on; the mother grabbed the book, threw it down the hall, and kicked the father in the head. The father testified that he slapped the mother, whereupon she hit him and he grabbed her wrists, pulled her down, and sat on her. According to the father, the mother asked the older son, who was then seven years old, to telephone emergency 911, and the father was arrested at the scene. A few months before the trial of this case, the father was convicted of making harassing communications, with the mother as the complaining witness. The father stated that he had appealed that conviction.
The parties presented evidence of several other physical altercations that had occurred during the marriage. On one occasion, while the family was eating sandwiches, a glass fell on the floor and shattered. The father cleaned up and made new sandwiches, but the mother, saying that she thought there was still glass in the food, "smashed" a sandwich into the father's face and asked, "Would you like to eat broken glass?" On another occasion, the parties began arguing while they were brushing their teeth, and, according *611 to the father, the mother squirted toothpaste all over his glasses.
The father testified that after one of the pendente lite hearings in this case the mother drove her vehicle behind the vehicle in which the father and the two children were riding and, as the father was waiting to pull out of the courthouse parking lot onto a busy highway, "rammed" her vehicle into the rear of the vehicle he was driving, backed up, and then pulled forward and struck his vehicle again. The mother disputed the father's account, stating that she had accidentally struck the father's vehicle only one time.
The mother testified that, on one occasion, when the father came to pick up the children for his scheduled visitation time, he was extremely angry at her. The mother said that, when she told the father that she did not want him to take the children with him when he was that angry, he threatened her and kicked a hole in the garage wall. Seeing that, the mother sent the children to their rooms and locked their doors. However, the children climbed out the windows and ran to the father's vehicle. According to the mother, the father drove away as the children taunted the mother. The father denied damaging the garage.
In 2004, the mother filed with the Department of Human Resources ("DHR") a child-abuse complaint alleging that the father had whipped the younger child with a belt when the child misbehaved in church. The mother reported that the whipping had left bruises and welts on the child's legs and buttocks. DHR determined that the complaint was unfounded. The father presented evidence indicating that the mother had disciplined the children by spanking them with a spatula and a bamboo stick.
The parties disagreed about the children's participation in extracurricular activities. The father wanted the boys to be involved in sports and scouting; he participated in those activities as a coach and as a parent volunteer. The mother thought those activities required the children to be out too late on too many school nights.
On the CS-41 form he submitted to the trial court on August 3, 2006, the father stated that he was "not currently employed" and listed his last position as "president and CEO of PowerCard, International." He listed no "employment income," but in the space for "other nonemployment related income" he wrote "$55,758.34 [divided by] 12 = $4,646.53." He attached an addendum to the CS-41 form explaining:
"I have three corporations, one S-Corp. and two C-Corps. I have not drawn a salary since 2001 when my company went into a three-year-plus litigation.
"For 2005, my dividend income from one C-Corp is $35,000 and from the other is $20,758.34. My distributions from the S-Corp total $191,416.54, which came from the prior year settlement income.
"Up until the settlement of September 2004, I lived off savings and then depleted my retirement account, etc. When the settlement came, I paid off taxes, legal fees, replenished my retirement account, etc. Since then I have only had distributions and dividend income with the intention of restructuring my company.
"I have paid my wife directly and indirectly $3,250 as instructed by the court. I paid an additional $35,000 to her in April 2005 to insure custodial mental evaluations were taken. I have paid for additional child care expenses averaging around $500 a month.
"Since my wife and her attorney refused to sign the 2004 tax return, I instructed my accountant to file an extension for *612 filing the 2005 return anticipating a divorce decree to resolve these issues. There is a $10,000 refund due for 2004. I understand my 2005 return will show an approximate gross income of $2,957.03, which is the net of the $55,758.34 in dividend income and the loss from the S-Corp. of approximately $52,801.31.
"The above figures are a close estimate which does not include any interest income.
"I have supported two households and also kept my offices open anticipating the opportunity to re-launch my company. There are no longer enough funds to do that without additional outside investment capital."
The S corporation to which the father referred in his addendum is PowerCard International, Inc. ("PowerCard"). The two C corporations to which he referred are ADDA, Inc. ("ADDA"), and ECB4U.Com, Inc. ("ECB4U"). A C corporation is a corporation whose income is taxed under Subchapter C of Chapter 1 of the Internal Revenue Code. In contrast, an S corporation is a corporation that makes a valid election to be taxed under Subchapter S of Chapter 1 of the Internal Revenue Code. Unlike a C corporation, an S corporation generally pays no corporate income taxes on its profits. Instead, the shareholders in the S corporation pay income taxes on their proportionate shares of the profits of the S corporation. See Coggin Auto. Corp. v. Commissioner, 292 F.3d 1326 (11th Cir.2002), in which the United States Court of Appeals for the Eleventh Circuit discussed the difference between a C corporation and an S corporation:
"Simply speaking, under Subchapter C of the Internal Revenue Code, the income of a C corporation is subject to corporate tax and any distributions it makes to its shareholders will be subject to a second, individual tax. Under Subchapter S, certain C corporations are permitted to elect to be S corporations. While the S corporation determines taxable income at the corporate level, this corporate income is passed through to the S shareholders and taxed to them at their individual rates."
292 F.3d at 1327 n. 3 (internal citations omitted).
The father testified that he had previously conducted business on the Internet via PowerCard. He explained that PowerCard was a "one-stop internet shopping-mall portal" that had been a multimillion-dollar business until its assets were frozen as the result of a class-action lawsuit in 2001. The father explained:
"The company had corrupted data that caused the transposition of some 17,000 files. And the technology transposed names, bank account numbers, routing numbers, and so forth. It caused a fund of almost $6 million to be frozen. It took four or five years of litigation to settle it."
The evidence was undisputed that in November 2003 PowerCard received a check in partial settlement of the litigation in the amount of $190,000; that after the litigation was finally resolved, the Baldwin circuit clerk's office issued PowerCard a check in the amount of $986,530.31 in August 2004; and that PowerCard received total settlement proceeds in the amount of $1,176,530.31. Much of the testimony at the parties' divorce trial consisted of the father's explanation for what he did with the settlement proceeds and the mother's attempt to cast doubt on his explanations.
The father testified that 2000 was the last year he drew a salary from PowerCard and that his salary in 2000 was $80,000. He said that he had been unemployed for three years  2001, 2002, and 2003  while PowerCard was in litigation. *613 During those years, he said, he lived on savings and credit cards and depleted his retirement account. The father testified that after he received the PowerCard settlement proceeds, he paid approximately $200,000 in taxes. Then, he said, he refunded his retirement account $200,000 for the sums he had withdrawn; set aside $50,000 to repay PowerCard stockholders in the event he decided to dissolve the company rather than relaunch it; paid $25,000 to settle separate legal issues he was handling; used part of the money  he did not specify how much  to have PowerCard purchase him a 2001 Mercedes sportutility vehicle; paid off $30,000 to $40,000 in credit-card debts; and repaid approximately $16,000 in commissions owed to one of his PowerCard stockholders.
The father presented ledgers he had prepared showing the cash receipts and disbursements of four entities  PowerCard, ADDA, ECB4U, and Stewart Giardina  from November 2003 through December 2005. The PowerCard ledger reveals that PowerCard made the following cash disbursements to ECB4U: $143,995.79, designated as "consulting fees" and paid in November 2003 and August 2004; $75,504.21, designated as "loan reimbursement" and paid in November 2003; $50,000, designated as "loan" and paid in August 2004. In August 2004, PowerCard made a cash disbursement to ADDA in the amount of $840,000, designated as "consulting." Under the heading "personal loans," PowerCard disbursed $60,758.34 to the father between November 2003 and October 2005. Tiffany Deroy, the father's accountant, testified about the entries on the ledger, but, she said, she had not audited the accounts or seen any supporting documents to verify the designations on the ledger; i.e., she had not seen any loan documents for the disbursements labeled "loan" or "loan reimbursement" or any invoices for the disbursements labeled "consulting fees" or "consulting."
The ECB4U ledger reveals that it paid ADDA a consulting fee in the amount of $26,000 in December 2003. ECB4U also made cash disbursements totaling $111,134.32 from November 2003 through August 2004, designated "business loan  paid charge card debt." The ADDA ledger reveals that under the heading "business cash disbursements" it made two payments totaling $220,000 to UBS Financial Services, which managed the father's defined-benefit retirement account, in November and December 2004, and under the heading "personal cash disbursements" it made 13 payments totaling $156,429.92 to the father between November 2003 and November 2005.
The Stewart Giardina ledger shows that the father received $46,968.20 in dividend income from ADDA between July 2004 and October 2004 and $45,000 in dividend income from ADDA in 2005. That ledger further shows that, between September 2004 and December 2005, the father paid $29,848.24 in "support to Nancy."
The documentary evidence admitted at trial indicates that there are two business checking accounts for PowerCard. One account is in the name of "PowerCard International, Inc. d/b/a ECB4U," and the other account is in the name of "PowerCard International, Inc. d/b/a KM.NET."
The father testified that, in addition to his Internet business, he also owned a 25% interest in a commercial construction enterprise called Gulf Shores Business Center ("GSBC"). GSBC had constructed a four-unit, 20,600 square-foot office condominium in Gulf Shores Industrial Park. The father purchased his stock in GSBC for $25,000 and pledged an $85,000 certificate of deposit to Regions Bank to secure *614 financing for GSBC. In connection with a loan application to Regions Bank relating to GSBC, the father submitted a financial statement indicating that his net worth was $292,000 in September 2005, seven months before trial.
The father stated that, although GSBC had contracts to sell three of the office condominium units, none of the sales had closed, and, he said, he and the other investors did not expect to make a profit on GSBC because of construction-cost overruns and a damaged slab on the building. The father testified that a few weeks before trial he had received a $52,000 distribution from GSBC, which represented part of a sum that GSBC had received as a "finders fee" on a real-estate transaction.
Documentary evidence established that the father had a UBS Financial Services defined-benefit retirement account with a balance of $221,378 as of August 31, 2005. The father testified that, a few months before trial, he had transferred the funds in the UBS account to an account at J.B. Hanover. No documentation regarding the J.B. Hanover account was submitted at trial. Documentary evidence indicated that the father had an E*Trade account with a balance of $31,613.88 in June 2005. Jeff Martina, who handled the father's day-trading activities, testified that the E*Trade account had a balance of approximately $15,000 at the time of trial. The father testified that in September 2005 he had $640,000 worth of nonmarketable securities, but, he said, the securities had been reduced in value by at least $200,000 because he had "expense[d] them" by paying living expenses for two households during the pendency of the divorce action.
The father's 2004 tax return reflects an adjusted gross income of $551,120. The father estimated that his net worth at the time of trial  not counting the marital residence, which he estimated was valued between $300,000 and $350,000, with a mortgage indebtedness of $205,000  was approximately $350,000. The father's accountant testified that the father's net worth was $412,166, with restricted assets of $305,277 and unrestricted assets of $106,889.
When the father was asked whether he planned to relaunch his PowerCard Internet business, he said that he had not yet decided. He explained that, on advice of counsel, he had put the matter "on hold" until the divorce proceedings were over. In response to questioning by the mother's attorney, the father acknowledged that in the spring of 2005 he had attempted to buy a condominium in Fort Walton, Florida, but, he said, the condominium development did not go forward.
At the time of trial, the mother was employed as a waitress at an Olive Garden restaurant earning $1,100 per month. She testified that she had between $38,000 and $39,000 in credit-card debt. She stated that, while the divorce action was pending, the father had told her "to put everything on the [credit] cards and they would be paid in full."

I. Custody

The mother argues that the trial court's custody award was erroneous for three reasons, namely: (1) because the trial court failed to apply, or to make an express finding with respect to, the presumptions of the Custody and Domestic or Family Abuse Act, § 30-3-130 et seq., Ala. Code 1975; (2) because the father had used his superior financial resources to alienate the children from her; and (3) because she had always been the primary caregiver for the children.
"When evidence in a child custody case has been presented ore tenus to the trial court, that court's findings of fact based on that evidence are presumed to be *615 correct." Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996). "This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases." Ex parte Fann, 810 So.2d 631, 633 (Ala.2001).
"The trial court is in the best position to make a custody determination  it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing. See Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), wherein [the Alabama Supreme] Court, quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala. Civ.App.1993), set out the well-established rule:
"`"Our standard of review is very limited in cases where the evidence is presented ore tenus. A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, Payne v. Payne, 550 So.2d 440 (Ala. Civ.App.1989), and Vail v. Vail, 532 So.2d 639 (Ala.Civ.App.1988), and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow. Gamble v. Gamble, 562 So.2d 1343 (Ala.Civ.App.1990); Flowers v. Flowers, 479 So.2d 1257 (Ala.Civ.App. 1985)."'"
Ex parte Bryowsky, 676 So.2d at 1324.
"In a divorce action between two fit parents, where there has been no prior custody determination and neither parent has voluntarily relinquished custody of the child, the `best interest' of the child is controlling; the parties stand on `equal footing' and no presumption inures to either parent. `"`The trial court's overriding consideration is the children's best interest and welfare.'"'"
Fell v. Fell, 869 So.2d 486, 494 (Ala.Civ. App.2003) (quoting Smith v. Smith, 727 So.2d 113, 114 (Ala.Civ.App.1998) (quoting in turn other cases)).
Section 30-3-133, a part of the Custody and Domestic or Family Abuse Act, provides:
"In every proceeding where there is at issue a dispute as to the custody of a child, a determination by the court that domestic or family violence has occurred raises a rebuttable presumption by the court that it is in the best interest of the child to reside with the parent who is not a perpetrator of domestic or family violence in the location of that parent's choice, within or outside the state."
The mother acknowledges that in Ex parte Fann, 810 So.2d 631, the Alabama Supreme Court held that a trial court is not required to make specific findings with respect to whether domestic violence has occurred or whether the presumption established in § 30-3-133 has been rebutted. She contends, however, that Fann and the decisions following it are distinguishable from this case because the father was actually convicted of domestic violence. Therefore, the mother says, the trial court was required to make an express finding as to whether the presumption that it was not in the best interest of the children to reside with the father had been rebutted. We disagree. Neither our supreme court's decision in Fann nor this court's decisions after Fann require such an express finding.
In Fann, the supreme court held that the plain language of the Custody and *616 Domestic or Family Abuse Act contains no requirement that a trial court make express findings, 810 So.2d at 633, and in so holding it reaffirmed the well-established principle that "`[w]here a trial court does not make specific findings of fact concerning an issue, this Court will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous,'" 810 So.2d at 636 (quoting Lemon v. Golf Terrace Owners Ass'n, 611 So.2d 263, 265 (Ala.1992)).
In McClelland v. McClelland, 841 So.2d 1264, 1267 (Ala.Civ.App.2002), this court outlined three circumstances under which the trial court is not required to apply the presumption of § 30-3-133:
"This court assumes that the trial court found either that the acts alleged by the wife did not occur, that the husband's acts did not constitute domestic abuse, or that both parties were guilty of abusive behavior. See J.H.F. v. P.S.F., 835 So.2d 1024, 1029 (Ala.Civ.App.2002). The record demonstrates that any of the foregoing findings would be supported by the evidence, depending on whose testimony the trial court determined was worthy of belief."
841 So.2d at 1268-69. If one of the three circumstances outlined in McClelland exists in a given case and the trial court is therefore not required to apply the presumption, then certainly the trial court is not required to make an express determination as to whether the presumption has been rebutted.
We agree with the mother that the trial court did not have the option of determining that the father had not committed domestic or family violence. The foreclosure of that option, however, does not resolve the custody issue because, in this case, as in McClelland, "each party accused the other of perpetrating domestic violence upon the other." 841 So.2d at 1267. If the trial court believed that the mother was also guilty of domestic abuse  despite the fact that she had not been convicted of a domestic-abuse offense  then the court was authorized not to apply the presumption of § 30-3-133. There was ample evidence from which the trial court could have determined that both parties were guilty of domestic abuse.
The mother next claims that, in awarding custody to the father, the trial court must have disregarded evidence indicating that the father had used his superior financial resources to alienate the children from her. Specifically, she says that the father tried to bribe the children to state a preference for living with him by buying them gifts and by taking them on trips to Disney World, to New Orleans, and to a Colorado ski resort.
Without necessarily agreeing with the mother's premise that the father's gifts and trips were a form of bribery or an attempt by the father to alienate the children from the mother, we note that the evidence supports the finding that the mother also tried to alienate the children from the father. The father presented evidence indicating that the mother had repeatedly denied or limited his visitation with the children, and the mother admitted that she had violated court orders in doing so. In an in camera interview with the trial judge, the parties' older son said that whenever his father arrived at a swim meet to cheer him on, his mother would "move [him] away from [the father] or ... take [him] out of the swimming meet." The older son also stated that his mother had tried to "coach" him about what to say to the trial judge; he stated that his father had not tried to coach him. Finally, the evidence indicated that the mother had disparaged the father to the children, telling them, among other things, that he did *617 not give them enough money to live on and that he was a liar, a convicted felon, and a thief who had stolen from their savings accounts for his own use. The mother's alienation argument demonstrates the reason for the ore tenus rule. As our supreme court stated in Ex parte Fann:
"We do not recite ... facts [as to the mother's attempted alienation of the children from the father] to reach or justify any conclusion; rather this contested evidence, taken in context, exemplifies the reason for the ore tenus presumption, `that is, that the trial court is in the ... position of discerning the demeanor and other like intangibles which do not transfer so readily in a transcript.' Shepherd v. Shepherd, 531 So.2d 668, 671 (Ala.Civ.App.1988). Stated another way, `the deference given to the trial court by the ore tenus rule is, in part, due to the trial court's unique position to see and/or hear something that may not be apparent on the face of the written record.' Willing v. Willing, 655 So.2d 1064, 1068 (Ala.Civ.App.1995) [(Thigpen, J., concurring in part and dissenting in part)]. See Dobbins v. Dobbins, 602 So.2d 900, 901 (Ala.Civ. App.1992) (`The reason for the ore tenus rule is [well established], i.e., that the trial court had the opportunity to observe the witnesses as they testified, to judge their credibility and demeanor, and to observe what this court cannot perceive from a written record.')."
810 So.2d at 638.
The mother argues that the best-interest standard dictates that she should be the custodial parent because she has always been the children's primary caregiver. We have no doubt that the trial court considered that factor and weighed it against other factors in making its custodial decision. With respect to the custody issue, the trial court's judgment states:
"The parties have endured a tempestuous marriage characterized by frequent arguments, financial difficulties, openly adulterous relationships and fundamental disagreements over child rearing. In arriving at its decision respecting the custody of the children, the court has taken into account the conduct of the parties, including the wife's adultery and apparent emotional instability as well as the desires of the children made known to the court during an `in chamber' interview made with the consent of both parties. The polestar of the court in this case is the best interest of the children. Upon consideration of all of the evidence in the case, the court is satisfied that the father ... is best able to provide for the needs and education of the children."
(Emphasis added.)
Initially, we note that it appears to be undisputed that the father condoned the mother's 1997 adultery. Condonation is "forgiveness by the offended spouse with the voluntary renewal or continuation of cohabitation." Harbin v. Harbin, 249 Ala. 616, 618, 32 So.2d 537, 538 (1947). Whether condonation of adultery by the offended spouse removes the adultery as a basis for a later child-custody determination adverse to the offending spouse is an issue that has not been specifically decided in Alabama. However, we think the applicable rule concerning a parent's adultery  whether condoned by the other parent or not  was stated in Jones v. Haraway, 537 So.2d 946 (Ala.Civ.App.1988). In that case, this court held that in matters of child custody and visitation a parent's sexual misconduct is "a factor to be considered, and our case law requires that there be evidence presented showing that such misconduct is detrimental to the child." 537 So.2d at 947. Since Haraway, this court has adhered to the "detrimental effect" *618 rule in cases alleging a parent's sexual misconduct. See, e.g., Case v. Case, 627 So.2d 980 (Ala.Civ.App.1993); Hearold v. Hearold, 620 So.2d 48, 48 (Ala.Civ.App. 1993); and Smith v. Smith, 586 So.2d 916, 918 (Ala.Civ.App.1991).
In reviewing the trial court's custody determination, we will not consider the mother's 1997 adultery,[2] because there was no evidence indicating what effect, if any, the mother's adultery had on the parties' older child,[3] who was three years old at the time. Moreover, the evidence concerning the other two factors on which the trial court relied  the mother's "apparent emotional instability" and the "desires of the children made known to the court during an `in chamber' interview"  supports the trial court's custody determination.
One view of the evidence did tend to show that the mother was emotionally unstable, and it is not our function to determine whether that view of the evidence was more or less credible than the contrary view. The father presented evidence indicating that, before the parties were married, the mother, who had been living with a boyfriend, had taken an overdose of narcotic drugs and had been found unconscious in a bathroom with a suicide note. He also presented evidence of two letters the mother had written him after the parties reconciled in 1997. The first letter was complimentary of him as a husband and as a provider. It expressed her gratitude to him and her regret for any pain she had caused him. The second letter, written a few weeks later, was filled with foul language excoriating the father for not meeting her needs and stating her opinion that the couple's marital problems could be attributed to her bad relationship with her parents. In contrast, Dr. Arata testified that the mother had related to her that she had a happy, normal childhood, got along well with her parents, and had never had "suicidal ideations."
The father presented evidence that, if believed by the trial court, tended to show that the mother's volatility was not limited to her interactions with the father, but also extended to her dealings with other adult associates. The father presented evidence from Beverly Grey, a licensed professional counselor who saw the parties after they reconciled in 1997 and agreed to undergo marital counseling, indicating that "[t]herapy was ineffective and the third session ended abruptly as [the mother] erupted in anger and became verbally abusive, using profanity toward [the counselor]." After the mother filed the divorce complaint and the court first ordered that the father's time with the children would be limited to supervised visitation, three adults who had known the parents through church, sports, or scouting activities agreed to act as "supervisors." All three individuals testified at trial.
Thomas Adent, who knew the parties and their children from sports and scouting, testified that the mother had twice telephoned him and left angry voice messages in which she cursed him. The audiotape *619 of the voice messages was played for the trial court. Adent also said that he had appeared in court as a witness on an earlier occasion in the divorce proceedings. At that time, he said, the mother swore at him and had to be escorted away by a sheriff's deputy. Stan Wiese, who was involved in the boys' scouting program with the father, testified that the father had once asked him to drive the boys home because he did not want to have a confrontation with the mother when he returned the children from visitation. Wiese said that the mother had told him to "mind [his] own f____ business and stay out of their business." Kimberly Hill, who knew the parties through church and scouting, testified that the mother had telephoned her and told her that if she supervised the father's visitation she would be obstructing justice and the mother would have her arrested. Karen Andrews, the father's first wife, testified that, before the trial of this case, the mother had asked her to testify falsely that the father had hit Andrews during their marriage.
If it believed the father's version of the "car-ramming" incident, the trial court could have concluded that the mother was so volatile that she allowed her anger at the father to jeopardize the children's safety and well-being. During in camera interviews with the trial judge, the children said that the mother gets angry easily and "cusses a lot." The older son stated that his mother had done "so many cruel things" that hurt his father, but, he said, "it hurts me more." The older son stated that his mother had repeatedly denied or curtailed the father's visitation rights, especially the Wednesday evening and summertime visitation periods. The older son also told the trial judge that his mother had removed him from Rainbows, a counseling program for children of divorced parents, because, he thought, "she's scared of everyone finding out about her behavior."
In making a custody determination, "`it is proper for the court to consider the "characteristics of those seeking custody, including age, character, stability, mental and physical health ... [and] the interpersonal relationship between each child and each parent."'" Smith v. Smith, 887 So.2d 257, 262 (Ala.Civ.App.2003) (quoting Graham v. Graham, 640 So.2d 963, 964 (Ala.Civ.App.1994), quoting in turn Ex parte Devine, 398 So.2d 686, 696-97 (Ala. 1981)). We cannot say that the trial court's findings as to the mother's apparent emotional instability and the desires of the children are plainly and palpably wrong or that the custody determination is plainly erroneous.
"Neither the Court of Civil Appeals nor [the Alabama Supreme] Court is allowed to reweigh the evidence.... This case, like all disputed custody cases, turns on the trial court's perception of the evidence. The trial court is in the better position to evaluate the credibility of the witnesses ... and the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody."
Ex parte Bryowsky, 676 So.2d at 1326. That part of the divorce judgment awarding sole physical custody of the children to the father is affirmed.

II. Alimony

The mother argues that the trial court exceeded the limits of its discretion by awarding her rehabilitative alimony in the amount of $1,500 per month for three years, an amount that, she says, is inadequate. She also contends that the trial court erred by failing to reserve jurisdiction *620 to award her permanent periodic alimony.
At the time of trial, the mother was employed as a waitress at an Olive Garden restaurant, earning $1,100 per month. She is relatively young and in good health. With the rehabilitative-alimony award, her income will be $2,600 per month or $31,200 per year. This court has defined rehabilitative alimony as "a sub-class of periodic alimony" that allows a spouse "time to reestablish a self-supporting status." Jeffcoat v. Jeffcoat, 628 So.2d 741, 743 (Ala. Civ.App.1993). The mother has an incentive to enhance her status and to become self-supporting by embarking on a program of educational or vocational study because she will receive a $5,000 reimbursement from the father if she completes that course of study. We cannot conclude that the rehabilitative-alimony award is inadequate.
As to the mother's argument that the trial court erred by failing to reserve jurisdiction to award her permanent periodic alimony, we note that, because rehabilitative alimony is "a sub-class of periodic alimony," Jeffcoat, supra, the mother has the right to seek future modification of her alimony award provided she exercises that right before the end of the three-year period, see Welch v. Welch, 361 So.2d 1090 (Ala.Civ.App.1978), and Banks v. Banks, 336 So.2d 1365 (Ala.Civ.App.1976).
We acknowledge that some of our prior decisions have implicitly rejected the idea that a spouse who has been awarded rehabilitative alimony must seek a modification of the award before the expiration date of the rehabilitative-alimony period or be forever barred from receiving periodic alimony. In Fowler v. Fowler, 773 So.2d 491, 495 (Ala.Civ.App.2000), overruled on other grounds by J.L. v. A.Y., 844 So.2d 1221, 1225 (Ala.Civ.App.2002), this court stated:
"We have previously held that when the court awards rehabilitative alimony based on the earning ability of the parties, their probable future prospects, and the length of the marriage, it is reversible error for the court not to reserve the right to award periodic alimony in the future. See Robinson v. Robinson, 623 So.2d 300 (Ala.Civ.App.1993); Sammons v. Sammons, 598 So.2d 941 (Ala. Civ.App.1992)."
Accordingly, we conclude that trial court erred by failing to reserve the issue of permanent periodic alimony.

III. Property Division

The mother argues that the trial court exceeded the limits of its discretion in fashioning a property division that, she says, is inequitable. In Ex parte Drummond, 785 So.2d 358, 360-61 (Ala.2000), the supreme court set out the standard that appellate courts apply in reviewing a trial court's judgment awarding alimony and dividing property:
"`A trial court's determination as to alimony and the division of property following an ore tenus presentation of the evidence is presumed correct. Parrish v. Parrish, 617 So.2d 1036 (Ala.Civ.App.1993). Moreover, issues of alimony and property division must be considered together, and the trial court's judgment will not be disturbed absent a finding that it is unsupported by the evidence so as to amount to an abuse of discretion. Id.'
"Morgan v. Morgan, 686 So.2d 308, 310 (Ala.Civ.App.1996). More recently, the Court of Civil Appeals has stated:
"`The trial court has wide discretion over alimony and the division of property, and it may use whatever means are reasonable and necessary to equitably divide the parties' property. *621 Grimsley v. Grimsley, 545 So.2d 75, 77 (Ala.Civ.App.1989). Its judgment is presumed correct and will not be reversed unless it is so unsupported by the evidence ... as to be unjust and palpably wrong. Grimsley, 545 So.2d at 76. However, that judgment is subject to review and revision. Moody v. Moody, 641 So.2d 818, 820 (Ala.Civ.App.1994). This court must consider the issues of property division and alimony together when reviewing the decision of the trial court, Albertson v. Albertson, 678 So.2d 118, 120 (Ala.Civ.App.1996), and, because the facts and circumstances of each divorce case are different, this court must also consider the particular facts and circumstances of the case being reviewed. Murphy v. Murphy, 624 So.2d 620, 623 (Ala.Civ.App.1993).'
"Bushnell v. Bushnell, 713 So.2d 962, 964-65 (Ala.Civ.App.1997)."
Depending upon the appraised value of the marital residence, the mother will receive between $47,500 and $72,500 for her half of the equity in the residence. She will receive rehabilitative alimony totaling $54,000 over a period of three years and a $5,000 reimbursement for any educational or vocational program she completes. She also is responsible for $38,000 to $39,000 in credit-card indebtedness.
The judgment awarded the mother "all of her property including the restored Cutlass automobile." However, the record does not indicate the value of the restored Cutlass automobile nor does it indicate whether the mother's property includes the 2001 Chrysler minivan that she drove during the marriage or any of the furniture and furnishings in the marital residence. The list of personal property on "Exhibit B" that the trial court awarded to the father does not include many items of furniture, yet the judgment requires the mother to "leave all the property in the house when she surrenders possession." (Emphasis added.) Therefore, it is unclear what items of personal property, other than the restored Cutlass automobile, the mother was awarded.
The mother complains that she was awarded no interest in the father's retirement account. The evidence, however, did not establish that the father had a qualified retirement account at the time of trial. The evidence indicated that on August 31, 2005, the father had a UBS Financial Services defined-benefit retirement account with a balance of $221,378. The father testified, however, that a few months before the trial he had transferred the funds in the UBS account to "an account" at J.B. Hanover. No documentation regarding the J.B. Hanover account was submitted at trial, and this court cannot presume that the father rolled over the funds from one retirement account to another retirement account, particularly in light of the undisputed evidence indicating that the father had not considered his retirement account to be inviolable in the past but had withdrawn funds from it under what he considered necessitous circumstances. Nevertheless, irrespective of whether the J.B. Hanover account is a qualified retirement account or not, it is subject to division as marital property.[4]
*622 In response to the mother's argument that the property division was inequitable, the father asserts that he paid the mother between $185,000 and $195,000 during the pendency of the divorce action. He says that that sum should be considered in determining whether the property division was equitable. We reject that argument, with a proviso. What the father paid to the mother pursuant to the trial court's pendente lite orders was support, for which the father was legally responsible because the parties were not yet divorced. Nevertheless, as the father testified and as the documentary evidence shows, the father reduced the value of his nonmarketable securities  his stock in PowerCard, ADDA, and ECB4U  by paying the mother's living expenses from the assets of those corporations. Thus, although the amount of support paid to the mother cannot be considered as a part of her property award, it can be considered in calculating the value of the father's award.
It is obvious to this court that the father has manipulated the assets of three corporations he controls to remove settlement proceeds of over $1 million from PowerCard  an S corporation whose income is taxable to him  and to transfer it, through various means for which no documentation was shown, to ADDA and ECB4U  C corporations whose income is taxable to him only when he receives salary or dividends.
The ADDA ledger prepared by the father shows that between March 2004 and December 2005 ADDA paid no dividends to the father and paid "net salary" to him in the amount of $28,588.12. The Stewart Giardina ledger, on the other hand, shows that the father received $46,968.20 in dividend income from ADDA between July and October 2004 and $45,000 in dividend income from ADDA in 2005. During the same time period, the father's ledger for ECB4U shows no dividend or salary payments to the father. In contrast, the addendum to the father's CS-41 form states that, for 2005, his "dividend income from one C-Corp is $35,000 and from the other is $20,758.34." The father's tax return for 2004 reflects an adjusted gross income in the amount of $551,120. On April 7, 2006, the father estimated that his net worth was between $650,00 and $700,000, but a month later his accountant testified that the father's net worth was $412,166, with restricted assets of $305,277 and unrestricted assets of $106,889. The accountant provided no further explanation regarding the father's net worth. This court cannot determine which of the father's statements concerning his income for 2004 and 2005 are correct, and only a forensic accountant could follow the trail of the PowerCard settlement proceeds or determine the father's current net worth.
Because we cannot determine what personal property, other than the restored Cutlass automobile, was awarded to the mother, because the trial court awarded the mother no interest in the father's J.B. Hanover account, and because the accuracy of the father's CS-41 form is called into question by evidence the father presented at trial, we reverse the trial court's judgment insofar as it divides the parties' property and remand this cause to the trial court with the following instructions: The trial court is directed to specify the personal property  including, but not limited to, the automobile or automobiles in the mother's possession at the time of the divorce and the furniture and furnishings in the marital residence  that it awarded to the mother. The trial court is *623 also directed to award the mother an equitable portion of the father's J.B. Hanover account. Finally, the trial court is instructed to decide whether the father's CS-41 form reflects the father's true income for 2004 and 2005. If the trial court finds that the form does not accurately reflect the father's true income, then the court is instructed to determine the father's true income and to reconsider the division of marital property in light of that determination.

IV. The New-Trial Issues

The mother contends that she is entitled to a new trial because (1) the trial court erroneously allowed the father to recall his accountant on the second day of trial  which occurred a month after the first day of trial  to provide evidence that the accountant was initially unable to provide; (2) the trial court erroneously allowed a police officer to state an opinion that, she says, was inadmissible; and (3) her trial attorney failed to call any witnesses, other than Dr. Arata, to testify in her behalf on the custody issue.
On April 7, 2006, the father's accountant was asked whether the spreadsheet from which she was testifying showed the father's net worth. She stated that it did not. She was then asked whether she "had some figures that show a net worth." She answered, "No, I do not." She continued with testimony concerning other matters and was eventually dismissed. When the trial resumed on May 2, 2006, the father recalled the accountant, and the mother objected, stating: "They have already called her and dismissed her from the stand." The trial court overruled the mother's objection, and the accountant provided an assessment of the father's net worth.
It is within the trial court's discretion to allow a witness who has been previously examined to be recalled. See Louisville & Nashville R.R. v. Barker, 96 Ala. 435, 438-39, 11 So. 453, 454 (1892); Milliken v. South Realty Co., 628 So.2d 928 (Ala.Civ.App.1993). The mother has not shown that the trial court exceeded the limits of its discretion in allowing the father's accountant to be recalled as a witness.
The other two issues raised by the mother have not been preserved for appellate review. The mother failed to object at trial to the police officer's testimony. Nor did she assert to the trial court the issue of her attorney's failure to call witnesses in her behalf. Both issues are raised for the first time on appeal. Rule 4(a)(3), Ala. R.App. P., provides:
"Any error or ground of reversal or modification of a judgment or order which was asserted in the trial court may be asserted on appeal without regard to whether such error or ground has been raised by motion in the trial court under Rule 52(b) or Rule 59, [Ala. R. Civ. P.]"
Rule 4 "prevents us from judicially determining issues that have been raised for the first time on appeal." University of Alabama Hosps. v. Alabama Renal Stone Inst., Inc., 518 So.2d 721, 725 (Ala.Civ.App. 1987). "Our review is limited to the issues that were before the trial court  an issue raised on appeal must have first been presented to and ruled on by the trial court." Norman v. Bozeman, 605 So.2d 1210, 1214 (Ala.1992).

Conclusion
That part of the divorce judgment awarding sole physical custody of the children to the father is affirmed. That part of the judgment awarding rehabilitative alimony to the mother is also affirmed. However, that part of the judgment dividing *624 the parties' property is reversed, and the cause is remanded with instructions to reserve jurisdiction to make an award of permanent periodic alimony and to make the specifications and determinations set out in Part III of this opinion.
APPLICATION OVERRULED; OPINION OF OCTOBER 5, 2007, WITHDRAWN; OPINION SUBSTITUTED; AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
PITTMAN, J., concurs.
BRYAN, J., concurs in part and concurs in the result in part, with writing.
THOMPSON, P.J., and MOORE, J., concur in the result, without writings.
BRYAN, Judge, concurring in part and concurring in the result in part.
I concur in Parts I, II, and IV of the main opinion, respectively titled "Custody," "Alimony," and "The New-Trial Issues." In Part III of the main opinion, titled "Property Division," I concur in the result.
NOTES
[1] The first protection-from-abuse action was assigned case number DR-04-518; the second action was assigned case number DR-04-518.01. The father moved to consolidate the two protection-from-abuse actions with the divorce action; the trial court granted the father's motion, stating that "the protection from abuse [actions] DR-2004-518.00 and DR-2004-518.01 are hereby consolidated with the divorce case DR-2004-301." The consolidated actions were not assigned a new consolidated case number; each action retained its originally assigned case number, thus indicating the trial court's intent to consolidate the actions only for the purpose of trial. See Rule 42(a), Ala. R. Civ. P.; Wilson Lumber Co. v. Compass Bank, 822 So.2d 435, 435 n. 1 (Ala.Civ.App.2001). "Where several actions are ordered to be consolidated for trial, each action retains its separate identity and thus requires the entry of a separate judgment." League v. McDonald, 355 So.2d 695, 697 (Ala. 1978). Although the mother's notice of appeal indicates that she appeals from the trial court's judgment in the protection-from-abuse actions (DR-04-518 and DR-04-518.01), the record contains no ruling with respect to those actions and they are therefore still pending in the trial court. Moreover, because the mother makes no argument on appeal with respect to the protection-from-abuse actions, we conclude that she intended to appeal only from the judgment of divorce.
[2] The father contends that the mother's adulterous conduct was not limited to the 1997 incident but also includes a 2005 incident when the mother allowed an unrelated male visitor to spend the night in the marital residence when the children were present. The mother testified that she had allowed a man whom she was dating to spend the night in her home for the same reason that she had allowed her parents to stay there on the same night. The mother said that all three individuals had sustained damage to their places of residence and had lost electrical power in the aftermath of Hurricane Katrina. The mother denied that any sexual contact between her and the visitor had occurred on that occasion.
[3] The parties' second child was not born until 1998.
[4] Had the father raised the issue at trial, § 30-2-51(b)(1), Ala.Code 1975, would have precluded the division of any retirement account held by the father because the parties had not been married "for a period of 10 years during which the retirement was being accumulated." "[T]he duration of the parties' marriage [is] measured by the date of the filing of the complaint for divorce." Smith v. Smith, 836 So.2d 893, 900 (Ala.Civ.App. 2002). The parties were married on July 1, 1994, and the mother filed her complaint for a divorce nine years and nine months later, on April 2, 2004. The father, however, did not assert that defensive matter at trial, and he has thereby waived the issue. See Brattmiller v. Brattmiller, 975 So.2d 359, 362 n. 1 (Ala.Civ.App.2007).