BRYAN, Judge.
Tiffany Sasser Meek (“the wife”) appeals from a judgment entered by the Baldwin Circuit Court (“the trial court”) that divorced her from William Patrick Meek (“the husband”).

Procedural History

This is the second time these parties have been before this court. In Meek v. Meek, 54 So.3d 389 (Ala.Civ.App.2010), we dismissed the wife’s initial appeal because it was taken from a nonfinal judgment. We set forth the pertinent facts and procedural history in Meek, supra, as follows:
“The parties married on March 11, 1995, and one child was born of the marriage, a girl born in May 2003 (‘the child’). On June 1, 2006, the husband filed a complaint for a divorce on the grounds of incompatibility of temperament and an irretrievable breakdown of the marriage. In his complaint, the husband requested that the trial court equitably divide the marital assets and liabilities of the parties. On June 26, 2006, the trial court entered a ‘standard’ order (‘the June 2006 order’) that addressed issues such as child support, visitation, the financial obligations of the parties, and the disposal of assets during the pendency of the divorce proceedings. The case was initially set for trial on September 26, 2006, but it was continued several times throughout 2006 and 2007.
“On November 26, 2007, the husband filed a motion seeking to hold the wife in contempt because, he alleged, the wife had restricted his visitation with the child in violation of the visitation provisions in the June 2006 order. The trial court conducted an ore tenus hearing on the pending divorce complaints and the husband’s motion for contempt on May 2, 2008, on July 31, 2008, and on November 12, 2008.
“On April 14, 2009, the wife filed an ‘Instanter Motion to Require Compliance with [the June 2006 order]’ (‘the wife’s motion for contempt’). In that motion, the wife alleged that the husband was in contempt of paragraph four of the June 2006 order, which ordered the parties ‘to pay debts incurred during the marriage and any other regular, recurring monthly financial obligations ... in the same manner and from the same sources as they have customarily been paid during the marriage.’ The wife also alleged that the husband was in contempt of paragraph five of the June 2006 order, which ordered that ‘[t]he parties shall not dispose of assets acquired during the marriage without leave of court, except where necessary in the normal and reasonable course of business.’ As noted in the wife’s motion for contempt, the June 2006 order was still in effect because the trial court had not entered another order changing or amending the provisions in the June 2006 order.
“The trial court conducted a hearing on the wife’s motion for contempt on May 4, 2009. A transcript from that hearing is in the record on appeal, and, during the hearing, the trial court stated that a ‘draft order’ had been sent via electronic mail (‘e-mail’) to the parties’ attorneys shortly after the final ore ten-us hearing in November 2008; apparently, the draft order contained certain provisions that the trial court wanted to include in the final judgment. The trial court determined that the draft order sent via e-mail was as effective as if the *545 decisions set forth in the draft order had been ‘verbally ordered ... from the bench.’ The record indicates that the trial court determined that the wife’s motion for contempt had been filed after a decision had been rendered, apparently referring to the draft order that was sent via e-mail. Thus, according to the trial court, the June 2006 order was no longer in effect at the time that the wife’s motion for contempt was filed. Following the hearing on the wife’s motion for contempt, the trial court entered an order that stated: ‘The [wife]’s [motion for contempt] will be taken as a Motion to Alter, Amend, or Vacate upon the entry of the Final Decree in this matter.’ ”
Id. at 891-92 (footnotes omitted).
The trial court purported to enter a final judgment of divorce on June 26, 2009 (“the June 2009 order”), but it did not rule on the husband’s or the wife’s pending contempt motions. The wife appealed that purported judgment to this court, and we concluded that the trial court’s June 2009 order was nonfinal and unappealable because the trial court had failed to rule on the pending contempt motions. Id. at 893-94.
After the dismissal of the wife’s appeal, the trial court conducted further proceedings on August 12, 2010, and entered a final judgment of divorce on August 13, 2010. Pursuant to that judgment, the wife was awarded legal and physical custody of the child, subject to the specific visitation rights of the husband. Regarding child support, the trial court stated that it had deviated from the child-support guidelines set forth in Rule 32, Ala. R. Jud. Admin., due in part to the child’s special diet, and awarded the wife $1,500 a month in child support, but the trial court allowed the husband to claim the income-tax exemption for the child until the wife was employed for more than six months. The husband was ordered to provide health insurance for the child, and he was ordered to pay all the child’s unpaid medical expenses. The husband was also ordered to pay one-half of the wife’s COBRA insurance for 24 months.
The wife was awarded 24 months of rehabilitative alimony in the amount of $2,700 a month. The trial court reserved the right to award the wife permanent periodic alimony in the future. The trial court awarded the husband all right, title, and interest in and to the martial residence, ordered the husband to pay off any liabilities secured by the marital residence, and ordered the marital residence to be sold. However, the wife was awarded all the equity in the marital residence after the residence sold, less the husband’s expenses for making necessary repairs to the marital residence. The trial court awarded the husband all right, title, and interest in and to all real property in his name, and it found that such property was not marital property.
The wife was awarded 100% of the funds in the husband’s retirement account as of November 12, 2008, excluding the husband’s loan against the account. The husband was awarded his vehicle, and the wife was awarded 100% of the equity in her vehicle after it was sold and the remaining debt on the vehicle was paid. Each party was responsible for debts in his or her name from November 12, 2008, forward, each party was awarded the personal property in his or her possession, except the husband was awarded a pitcher, a miniature yacht, and family photographs that were in the wife’s possession. The husband was ordered to pay $10,000 toward payment of the wife’s attorney’s fees.
The husband’s November 2007 motion for contempt and the wife’s April 2009 motion for contempt were denied. Howev *546 er, the trial court found that the husband had failed to pay all sums due pursuant to the June 2006 order, and the trial court ordered the husband to pay $14,413 to the wife. The wife timely appealed.

Issues

The wife raises four issues for this court to consider on appeal: (1) whether the trial court exceeded its discretion in fashioning the husband’s visitation rights in light of the evidence presented; (2) whether the trial court erred by determining that the husband owed only $14,413 pursuant to the June 2006 order; (3) whether the trial court exceeded its discretion in dividing the parties’ property and awarding her only 24 months of rehabilitative alimony; and (4) whether the trial court erred by awarding the husband the income-tax exemption for the child until she maintained employment for six months.

Facts

The parties separated in May 2006, after 11 years of marriage. At that time, the husband was approximately 38 years old, the wife was approximately 36 years old, and the child was 3 years old. The child had been born approximately 20 weeks premature, and she suffered from numerous medical maladies, as well as autism. The wife maintained that the child was severely autistic and that the child was required to maintain a strict gluten/casein-free diet in order to prohibit autistic regression. It was undisputed that, at the time of trial, the child required near constant care.
The husband indicated, throughout his testimony, that he was unsure if the child was autistic. The husband did not deny that the child had special needs or that she was required to maintain a gluten/casein-free diet, but he believed that the child’s medical condition was because of her extremely premature birth. The husband stated that he had seen great improvements in the child and that, despite her developmental delays, he believed that the child would be able to care for herself at some point in the future.
The wife testified that the progress the child had made was due to a stable environment and a rigorous schedule of therapy, including six hours a week of speech therapy, seven hours a week of hyperbaric therapy, two hours a week of occupational therapy, and two hours a week of physical therapy. The wife stated that each hyper-baric treatment, which the child received three times a week, cost $100 but that the child’s doctor had not been charging her for treatment until after the divorce was finalized. The wife stated that she wanted the funds in the husband’s retirement account to be utilized to purchase a hyper-baric chamber that she could use at home, which she estimated would cost between $16,000 and $18,000.
The wife estimated that the child’s special diet cost approximately $1,000 a month. The wife testified that she had allowed the child to eat ice cream on her third birthday and that it had caused the child to regress into autistic behaviors. The wife stated that she had maintained a strict diet for the child since that time, but, according to the wife, the husband had no understanding of the child’s medical limitations or the requirement that she maintain a strict gluten/casein-free diet. The child took 12 different vitamins and medications every day, which cost approximately $200 a month.
The husband stated that he had obeyed the child’s dietary recommendations and that he intended to continue to adhere to those recommendations. The husband stated that he had bathed the child, prepared her meals, fed her, brushed her teeth, and administered her medication whenever he was home from work.
*547 The wife testified that, after the husband took the child to Mobile Bay in June 2007 during a visit, the child exhibited symptoms indicating that she had regressed and also contracted rotavirus, pneumonia, and asthma. The husband stated that he had allowed the child to put her legs in Mobile Bay, and there was no indication, other than the wife’s testimony, that the husband’s actions were a direct cause of the child’s illnesses. However, from that point forward, the wife required the husband to remain at her home during his visitation periods with the child, and the wife requested that the trial court require the husband to remain in her home during his visitation periods with the child. The wife stated that the husband could visit the child anytime he would like, as long as he called first, as long as he had not been drinking, and as long as he did not try to feed the child food that was not within her dietary restrictions. The wife stated that “there will never be a day that if he calls me that I will tell him he cannot come.” She later testified that the husband was welcome to visit the child anytime he chose to and that she had an “open-door policy” for visitations.
The wife stated that the husband’s lack of understanding of the child’s medical condition posed a danger to the child and that that was the reason she did not want the husband to visit the child without her supervision. She also stated that the use of alcohol, smokeless tobacco, or cigarettes around the child would be detrimental to the child. The husband admitted that he drank alcohol and used smokeless tobacco, and the wife stated that the husband had refused to stop using smokeless tobacco around the child.
One of the child’s doctors, Dr. Mary Megson, indicated in a letter dated August 1, 2006, that the flicker of lights on long car rides overstimulated the child’s nervous system and could lead to migraines and autistic regression. The wife testified that she had not traveled with the child after she learned of her autism diagnosis because, she said, traveling caused the child to go into a “zombie-like” state, and, she believed, it was contrary to the child’s well being for her to travel any distance other than to get treatment. However, the husband stated that the child had been on long car rides before — to Atlanta, Georgia, to Ocean Springs, Mississippi, and to Destín, Florida — and that the child had never complained of migraines and he had not noticed any change in her behavior. The wife stated that she had spoken to the child’s ophthalmologist about dark-tinted glasses for the child to wear while traveling, but the ophthalmologist, relying on Dr. Megson’s August 2006 letter, recommended that the child should not travel.
Andrea Pointer, the child’s speech and language pathologist, testified that she began treating the child in April 2004. At the time of the November 2008 hearing, the child was receiving therapy approximately five days a week from Pointer and five other therapists for a total of six hours of therapy a week. Pointer stated that she had observed the child engage in self-stimulatory behaviors, such as spinning in circles, when she was not in a controlled environment or when there had been any slight change in her environment. Pointer stated that the child has a compromised immune system because she was born premature.
After the parties separated, the husband moved from Fairhope, where the parties had been living, to Elba, where the husband’s family lived. By the time of the July 2008 hearing, the husband was living in a house in Enterprise with his girlfriend. According to the husband, the wife would not allow the husband to take the child to Enterprise, which is approximately *548 a three-hour drive from Fairhope, for visitation because she was opposed to the child’s riding in a vehicle for a long period.
At the time the parties separated and throughout the proceedings below, the husband worked as an engineer on an oil rig and his gross monthly income was $9,746 a month, or approximately $117,000 a year. The husband worked for two consecutive weeks each month and then had two consecutive weeks off of work. The wife worked as a teacher, specifically, a speech and language pathologist, in Baldwin County until early 2003 when she suffered complications during her pregnancy with the child. At that time, the wife earned approximately $32,000 a year, but the wife never returned to the workforce. The husband acknowledged that the wife had stayed home to care for the child since her birth and that she had been an excellent caretaker for the child. However, the husband stated that he did not believe there was any reason why the wife could not go back to work once the child started school.
The wife testified that she desired to return to work when the time came that the child did not require her constant care. The wife also stated, however, that she was no longer qualified to work as a speech and language pathologist because her certification had expired. The wife stated that in order to return to work as a speech and language pathologist she was required to obtain a master’s degree, and she asked that the husband be required to pay the tuition for her to obtain her master’s degree. At the time of the November 2008 hearing, the wife stated that it was unlikely that the child’s condition would change in the next several years so as to allow her to obtain the certification she needed to return to work. The parties testified that they had attempted to enroll the child in school before they separated, but, because of her special diet, the school would not accept her. According to the husband, the child had told him that she was starting school in the fall of 2008, but there is no indication in the record that the child had actually begun school at that time. The wife stated that she did not think that the child, who was five years old at the time of the November 2008 hearing, would be able to attend public or private school because of her compromised immune system, her inability to be vaccinated, and her visual, auditory, and tactile hypersensitivity, among other reasons. The wife admitted that Dr. Megson had not stated that the child would not be able to attend school at some point in the future.
The husband stated that the parties had purchased the marital residence in November 2005 for approximately $425,000. There were two mortgages encumbering the marital residence, which totaled approximately $395,000 in May 2006, and the total monthly mortgage payment was $2,670. The husband stated that he was willing to allow the wife to keep the furnishings in the martial residence, which he valued at approximately $50,000. By the conclusion of trial, the parties agreed that there was no equity in the marital residence.
At the time of trial, the husband had an interest in two pieces of property in Elba: a one-quarter interest in a 20-acre tract of land, which is what remained from a larger tract he had inherited an interest in from his father, and a one-third interest in 162 acres of timberland that had been a gift from the husband’s grandfather to the husband, his mother, and his brother. The wife’s name was not on the title to either piece of property. The record indicates that, shortly before the parties separated, the husband received $56,000 from the sale of part of the tract of land that he had *549 inherited an interest in from his father.[1] According to the husband, he deposited that money into an account he held jointly with the wife and that, in approximately two weeks, the wife had depleted those funds so that only $2,000 remained. The husband indicated that his one-quarter interest in the 20-acre tract of land had never been used for the common benefit of the parties. The husband stated that he had allowed a friend to share his interest in that land for $2,500 so that man could build a boat ramp on the property. The husband indicated that he had not transferred a deed to his friend and that it had been a “handshake” deal. Regarding the 162-acre tract of timberland, the husband stated that, approximately 8 to 10 years before trial, “we” received $10,000 from the sale of timber on that land. The husband did not indicate whether he and the wife or he and his brother and mother had received $10,000 from the sale of timber. There is also no evidence in the record indicating that the money received from the sale of timber was used for the common benefit of the parties.
The wife drove a BMW 525 that the husband valued at $40,000. The husband had been paying the wife’s monthly car payment in the amount of $545 a month, and, according to the husband, the parties owed $23,000 on the wife’s vehicle. The husband drove a 2008 Toyota truck that was paid for, and he estimated that his truck was worth $10,000. The husband stated that he had approximately $12,550 in a retirement account and that that amount had been accumulated during the marriage. However, the value of the husband’s retirement account increased by approximately $4,000 before the conclusion of the trial.
The husband testified that the wife had kept the parties income-tax refund in 2008, which was over $17,000. The wife presented the husband with an itemized list of how that money had been used to support herself and the child after the parties separated.
The husband projected that his budget after the parties were divorced would be approximately $4,355 a month. The husband testified that he had accumulated approximately $40,000 in unsecured debt in his name after the parties separated. The husband testified that he had taken his girlfriend on approximately six vacations during 2007, including a trip to Key West, Florida. The husband stated that he borrowed $4,000 to finance that vacation and that he had spent several hundred dollars at massage parlors and a florist.
The husband’s actual expenses totaled $1,890 a month, and he testified that he had been paying approximately $5,000 a month towards the wife and the child’s expenses since the parties separated in May 2006. The wife stated that the parties’ household bills usually totaled around $7,000 a month. According to the wife, while the parties were separated, the husband had given her between $2,400 and $2,800 a month in addition to paying the mortgages on the marital residence. However, after the conclusion of the November 2008 hearing, the husband gave the wife between $1,000 and $1,545 a month, but he also contributed $5,123 a month to household expenses, including payment of the mortgages on the marital residence.
The wife testified that she had notified the husband that she did not have enough money to care for the child or to pay the utility bills at the marital residence, and, *550 according to the wife, the husband had told her to light candles and to sell their belongings. The wife stated that she had credit-card debt in her name only in the amount of $85,000 that had accumulated before and after the parties separated. The wife submitted an exhibit of her monthly expenses, which totaled approximately $6,100 a month, not including the cost of the monthly mortgages on the marital residence.

Standard of Review

“When a trial court receives ore tenus evidence, its judgment based on that evidence is entitled to a presumption of correctness on appeal and will not be reversed absent a showing that the trial court exceeded its discretion or that the judgment is so unsupported by the evidence as to be plainly and palpably wrong. Scholl v. Parsons, 655 So.2d 1060, 1062 (Ala.Civ.App.1995). This ‘presumption of correctness is based in part on the trial court’s unique ability to observe the parties and the witnesses and to evaluate their credibility and demeanor.’ Littleton v. Littleton, 741 So.2d 1083, 1085 (Ala.Civ.App.1999). This court is not permitted to reweigh the evidence on appeal and substitute its judgment for that of the trial court. Somers v. McCoy, 777 So.2d 141, 142 (Ala.Civ.App.2000).”
Stone v. Stone, 26 So.3d 1232, 1235-36 (Ala.Civ.App.2009).

Analysis

I. Visitation
The wife first argues that the trial court erred in its award of visitation to the husband in light of the medical evidence presented and the evidence indicating the husband’s failure to grasp the seriousness of the child’s medical condition. In the divorce judgment, the trial court provided that the husband’s first visit should be at the wife’s residence and that, during that visit, the wife was required to
“go over with the [husband] the child’s current medical issues, describing them fully, and she shall provide the [husband] with a schedule of the child’s typical day. The [husband] in his future visitation is to attempt to replicate the child’s typical day schedule as best he can. The [wife] shall ... educat[e] the [husband] on the child’s diet. The parties shall prepare a meal for the child together and they shall feed the child.”
The judgment further provided that the husband’s next visitation shall take place in Fairhope for four hours, “but the [husband] shall be allowed, on that day, to take the ... child to the Sunflower Café to eat without the presence of the [wife].” The husband’s next two visits with the child were to occur in Enterprise from Saturday at noon until Sunday at noon. The wife was allowed to transport the child to Enterprise, and the wife and the husband were ordered to go shopping together for food for the child to eat during the husband’s visitation period. After those four visits, the husband was awarded “Schedule A” visitation “at his residence or such other place as he deems appropriate....” [2] The judgment further stated:
“e. [The husband] is responsible for all transportation and transportation expense to and from his parenting time. If the [wife] transports the child, the [husband] shall pay the expense of said transportation.
*551 “f. Neither parent shall permit the child to go into any natural waters, like rivers, bays, creeks or ponds.
“g. Only these parents shall discipline the minor child and they shall not suffer or permit others to corporally discipline the child.
“h. The [husband] shall further be permitted to see the minor child at any other time he can in Fairhope, Alabama, after first providing forty-eight (48) hours notice to the [wife], consent to which shall not be unreasonably withheld by the [wife].
“i. The [husband] shall be accorded the holiday schedule in keeping with Schedule ‘B’....
“j. The [husband] shall have telephone visitation in keeping with Schedule‘A’....
“k. The [husband] can get emergency care for the child, but any other type of medical care for the child shall be left to the [wife].
“1. There shall be no smoking anywhere around the minor child, and neither parent shall suffer nor permit the same.
“m. There shall be no smokeless tobacco anywhere around the minor child and no one shall use this tobacco while caring for the child.
“n. There shall be nothing unsanitary around the child, or anything that would, to a reasonable person, be deemed germ-laden.
“o. The child’s diet, as recommended by her physicians, shall be followed without exception.
“p. [The husband] shall not drink alcohol in any form while caring for the minor child, or within twenty-four (24) hours of assuming her care.
“q. Neither party shall cohabit with a member of the opposite sex to whom he or she is not married nor related by blood or marriage, and with whom he or she is sexually intimate, while caring for the minor child.”
In Pratt v. Pratt, 56 So.3d 638, 641 (Ala.Civ.App.2010), this court set forth the applicable law regarding a trial court’s ability to determine an appropriate visitation schedule for a noncustodial parent:
“ ‘The trial court has broad discretion in determining the visitation rights of a noncustodial parent, and its decision in this regard will not be reversed absent an abuse of discretion.’ Carr v. Broyles, 652 So.2d 299, 303 (Ala.Civ.App.1994). In exercising its discretion over visitation matters, ‘ “[t]he trial court is entrusted to balance the rights of the parents with the child’s best interests to fashion a visitation award that is tailored to the specific facts and circumstances of the individual case.” ’ Ratliff v. Ratliff, 5 So.3d 570, 586 (Ala.Civ.App.2008) (quoting Nauditt v. Haddock, 882 So.2d 364, 367 (Ala.Civ.App.2003) (plurality opinion)). A noncustodial parent generally enjoys ‘reasonable rights of visitation’ with his or her children. Naylor v. Oden, 415 So.2d 1118, 1120 (Ala.Civ.App.1982). However, those rights may be restricted in order to protect children from conduct, conditions, or circumstances surrounding their noncustodial parent that endanger the children’s health, safety, or well-being. See Ex parte Thompson, 51 So.3d 265, 272 (Ala.2010) (‘A trial court in establishing visitation privileges for a noncustodial parent must consider the best interests and welfare of the minor child and, where appropriate, as in this case, set conditions on visitation that protect the child.’). In fashioning the appropriate restrictions, out of respect for the public policy encouraging interaction between noncustodial parents and their children, *552 see Ala.Code 1975, § 30-3-150 (addressing joint custody), and § 30-3-160 (addressing Alabama Parent-Child Relationship Protection Act), the trial court may not use an overbroad restriction that does more than necessary to protect the children. See Smith v. Smith, 887 So.2d 257 (Ala.Civ.App.2003), and Smith v. Smith, 599 So.2d 1182, 1187 (Ala.Civ.App.1991).”
On appeal, the wife argues that the trial court erred in failing to place more restrictions on the husband’s visitation with the child because: (1) Dr. Megson recommended that the child avoid lengthy unnecessary vehicular transportation; (2) the husband was unwilling to admit that the child was not like a typical child her age; and (3) the evidence indicated that the husband would not follow the visitation parameters in the judgment.
As set forth above, Dr. Megson, in August 2006, wrote that the child should avoid long car rides because the flicker of lights could lead to migraines and autistic regression in the child. In a letter written in April 2008 to the wife’s attorney, Dr. Megson stated that “it is important that [the child] is in a consistent home environment where her autism treatments are understood and followed, including supplements [and] diet[,] and that she has a predictable routine.” The wife argues that this evidence was undisputed and, thus, that it was not subject to the ore tenus rule.
The wife cites no authority, and we are not aware of any, that requires a trial court, in lieu of exercising its discretion, to adhere to a recommendation of an expert in a custody or visitation action. See, e.g., Ex parte R.D.N., 918 So.2d 100, 105 (Ala.2005) (noting that a trial court has the discretion to “disagree[] with the recommendation of its court-appointed professional in evaluating [a] custody issue”). Expert witnesses are used during trial to assist the trier of fact in making a determination of the issues presented, but they do not make the final decision regarding the controversy before the trial court or the jury. That task is for the trier of fact, in this case the trial-court judge, after consideration of all the testimony — expert and lay — as well as any other evidence presented by the parties. See Ford v. Ford, 54 Ala.App. 510, 513, 310 So.2d 230, 232 (Civ.App.1974) (“The role of an expert witness is to assist in reaching a proper conclusion from facts presented, which because of want of experience or knowledge the court or jury is incapable of determining by themselves.”). Although we agree with the wife that the trial court was not at liberty to disregard Dr. Megson’s statements, we cannot conclude that the trial court erred by allowing the child to visit the husband at his home in Enterprise.
Although the child’s doctors recommended that the child avoid unnecessary car rides because there was a possibility that the flicker of lights would result in migraines or autistic regression, the husband testified that the child had been on long car rides before and that he had never noticed any detrimental effect on the child. There was some indication that the child had not been on a long car ride since Dr. Megson’s August 2006 letter was written, but the trial court could have concluded that there were ways to protect the child from the flicker of lights during her time in a vehicle and that the husband’s right to visitation with the child, without interference from the wife, merited an award of visitation at his home in Enterprise. Thus, the trial court could have concluded that to refuse to allow the child to visit with the husband at his home in Enterprise would have been an overly broad restriction that did more than necessary to protect the child. The visitation *553 parameters set forth in the trial court’s judgment required the husband to maintain the child’s schedule as much a possible during his visitation periods in order to limit any possible detrimental impact to the child based on a change in her environment.
The wife also argues that the husband repeatedly indicated in his testimony that he did not comprehend the seriousness of the child’s medical condition and that his testimony indicated that he would not abide by the parameters set forth in the divorce judgment. We agree that the husband’s testimony indicated that he was unsure that autism was the source of the child’s medical conditions and that he did not believe that the child’s condition was as catastrophic as the wife suggested. However, he did not deny that the child had special needs, and he stated that he understood that the child had to remain on a strict gluten/casein-free diet. Furthermore, we cannot reverse the judgment of the trial court on the basis that the husband may not abide by the restrictions in the judgment.
The wife also argues that the visitation award is too broad because it allows the husband to exercise visitation with the child at any location he deems appropriate, instead of only at the husband’s residence, and allows him to visit the child in Fair-hope at any time after giving the wife 48 hours’ notice. We cannot conclude that either of these arguments requires reversal of the visitation award. The record indicates that the trial court refused to confine the husband to his home during periods of visitation with the child because the judgment provided ample protections for the child’s well-being. Regarding the provision that allows the husband to visit the child at any time in Fairhope after 48 hours’ notice to the wife, the record reveals that the wife or her attorney, on multiple occasions in the record, stated that the wife was willing to allow the husband to visit the child at her home in Fairhope at any time, as long as he provided reasonable notice. These repeated assurances could have led the trial court to commit the alleged error that the wife now complains of on appeal. See Mobile Infirmary Med. Ctr. v. Hodgen, 884 So.2d 801, 808 (Ala.2003) (quoting Neal v. Neal, 856 So.2d 766, 784 (Ala.2002)) (“ ‘A party cannot win a reversal on an error that party has invited the trial court to commit.’”).
After a thorough review of the record and after considering the arguments of the parties on appeal, we cannot conclude that the trial court exceeded its discretion in setting forth the husband’s visitation rights. Accordingly, that aspect of the judgment is due to be affirmed.
II. Enforcement of the June 2006 Order
The wife argues that the trial court failed to fully enforce the June 2006 order by requiring the husband to pay only $14,413. The August 2010 hearing was conducted in order to determine the amount, if any, the husband owed the wife for his failure to pay marital expenses during the divorce proceeding in a manner consistent with the June 2006 order. After the husband and the wife testified, the husband’s attorney stated that the issues addressed at that hearing had been addressed in a “.02 contempt” action (i.e., case no. DR-06-589.02) that had apparently been filed sometime after the June 2009 order had been entered. The trial court stated that the contempt motion had been filed with a different case-number designation for “whatever reason” and that the order entered in that action had dealt with, among other things, the husband’s obligations pursuant to the June 2006 order. The parties repeatedly referenced an order that had been entered by the trial court in case no. DR-06-589.02 on Septem *554 ber 4, 2009; however, neither that order nor the record of the hearing preceding the entry of that order are in the record on appeal.
According to the transcript from the August 2010 hearing, the trial court stated that, based on the testimony presented before the entry of the September 4, 2009, order, it had determined that between June 2006 and November 2008 the husband had failed to pay approximately $497 a month that he should have paid pursuant to the June 2006 order. The total arrearage for that period totaled $14,413. The trial court also stated that it had determined that from December 2008 through September 2009 the husband had failed to pay the wife $23,455.28. It is undisputed that the trial court previously had entered a judgment against the husband in the amount of $23,455.28. The trial court stated that it had notes regarding testimony as to every payment made by the husband to the wife and that its calculations were based on that testimony. The wife did not object to the trial court’s use of that testimony to determine the amount the husband owed her pursuant to the June 2006 order. The wife also did not argue, in a postjudgment motion, that the trial court had erred in calculating the husband’s financial obligation to the wife pursuant to the June 2006 order, that the trial court had failed to fully enforce the June 2006 order, or that there was insufficient evidence to support the trial court’s determination of the husband’s obligation pursuant to the June 2006 order. Accordingly, this court may not consider the wife’s argument on appeal because it was not first presented to the trial court. See Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992). Accordingly, that aspect of the divorce judgment awarding the wife $14,413 for the husband’s failure to pay all sums due pursuant to the June 2006 order is affirmed.
III. Division of Property and Award of Alimony
“The issues of property division and alimony are interrelated, and, therefore, they must be considered together on appeal. Albertson v. Albertson, 678 So.2d 118, 120 (Ala.Civ.App.1995). When the trial court fashions a property division following the presentation of ore tenus evidence, its judgment as to that evidence is presumed correct on appeal and will not be reversed absent a showing that the trial court exceeded its discretion or that its decision is plainly and palpably wrong. Roberts v. Roberts, 802 So.2d 230, 235 (Ala.Civ.App.2001); Parrish v. Parrish, 617 So.2d 1036, 1038 (Ala.Civ.App.1993); and Hall v. Mazzone, 486 So.2d 408, 410 (Ala.1986). A property division is re quired to be equitable, not equal, and a determination of what is equitable rests within the broad discretion of the trial court. Parrish, 617 So.2d at 1038. In fashioning a property division and an award of alimony, the trial court must consider factors such as the earning capacities of the parties; their future prospects; their ages, health, and station in life; the length of the parties’ marriage; and the source, value, and type of marital property. Robinson v. Robinson, 795 So.2d 729, 734 (Ala.Civ.App.2001). ‘[W]e note that there is no rigid standard or mathematical formula on which a trial court must base its determination of alimony and the division of marital assets.’ Yohey v. Yohey, 890 So.2d 160, 164 (Ala.Civ.App.2004).”
Stone v. Stone, 26 So.3d at 1236.
The wife argues that the award of alimony and the division of property was inequitable because the trial court award *555 ed her only 24 months of rehabilitative alimony instead of permanent periodic alimony and because it determined that the husband had a separate estate. First, we will consider the wife’s argument that the trial court erred in determining that the husband’s property that he had received by way of gift or inheritance was part of his separate estate.
It is well settled that “[t]he determination whether property is marital property or belongs to the separate estate of one of the parties is a matter generally within the trial court’s discretion.” Kaufman v. Kaufman, 934 So.2d 1073, 1080 (Ala.Civ.App.2005) (citing Alston v. Alston, 555 So.2d 1128 (Ala.Civ.App.1989)).
“A party’s ‘“separate estate” is that property over which [he or] she exercises exclusive control and from which the [spouse] ... derives no benefit by reason of the marital relationship.’ Gartman v. Gartman, 376 So.2d 711, 713 (Ala.Civ.App.1978). The separate estate of the parties in a divorce proceeding includes property owned prior to the marriage and property received by gift or inheritance during the marriage. § 30-2-51(a), Ala.Code 1975. Although marital property generally includes property purchased or otherwise accumulated by the parties during the marriage, it may also include the property acquired before the marriage or received by gift or inheritance during the marriage when it is used, or income from it is used, regularly for the common benefit of the parties during their marriage. See § 30-2-51(a), Ala.Code 1975.
“The trial judge is granted broad discretion in determining whether property purchased before the parties’ marriage or received by gift or inheritance was used ‘regularly for the common benefit of the parties during the marriage.’ See § 30-2-51, Ala.Code 1975. Even if the trial court determines that such property was regularly used for the common benefit of the parties during the marriage, the determination whether to include such property in the marital assets to be divided between the parties lies within the discretion of the trial court. [Ex parte ] Durbin, 818 So.2d 404 (Ala.2001).”
Nichols v. Nichols, 824 So.2d 797, 802 (Ala.Civ.App.2001).
The wife argues that the husband’s inherited interest in the 20-acre tract is marital property because a portion of that once larger tract was sold during the marriage and the funds from that sale were used for the common benefit of the parties. The wife does not cite any authority to support her implicit proposition that the trial court was required to conclude that the husband’s remaining interest in the 20-acre tract was regularly used for the common benefit of the parties simply because a parcel of the larger tract had been sold and the husband had exercised his discretion to use the proceeds he received from the sale to pay the parties’ debts.
Furthermore, regarding the 162-acre tract of timberland that the husband owned jointly with his mother and his brother, there is scant evidence in the record to support the wife’s assertions on appeal that the husband had used the proceeds from the sale of timber for the common benefit of the parties during the marriage.[3] Even assuming that the husband *556 did use those funds for the common benefit of the parties during the marriage, we cannot conclude that the trial court exceeded its discretion by concluding that the one-time use of the proceeds from the sale of timber did not constitute a “regular” use for the benefit of the parties sufficient to make the husband’s interest in the 162-acre tract marital property. See Hull v. Hull, 887 So.2d 904, 909 (Ala.Civ.App.2003) (concluding that the wife’s one-time use of inherited funds for the common benefit of the parties did not constitute a “regular” use of her separate property and that the trial court was therefore “precluded by § 30-2-51(a)[, Ala.Code 1975,] from considering [her separate property] at all in dividing the parties’ marital property”).
Accordingly, we conclude that the trial court did not exceed its discretion by determining that the husband’s interest in the 20-acre tract of land and his interest in the 162-acre tract of land were part of his separate estate.
Pursuant to the August 2010 divorce judgment, the wife was awarded $2,700 a month in rehabilitative alimony for 24 months ($64,800 total); 100% of the husband’s retirement account (approximately $16,550); 100% of the equity in her vehicle (approximately $17,000); the furnishings in the marital residence (approximately $50,000); and attorney’s fees in the amount of $10,000. The wife also received a judgment in the amount of $14,413 against the husband for sums he failed to pay pursuant to the June 2006 order (discussed supra) in addition to the sums that the husband paid throughout the divorce proceeding. According to the wife’s testimony, the husband paid approximately $5,000 a month in household expenses in addition to giving her between $1,000 and $1,500 a month. The record indicated that the wife was able to use the parties’ $17,000 tax refund for the payment of pen-dente lite expenses. The wife was ordered to pay all debts in her name that were incurred from November 12, 2008, forward. The record indicated that the wife had incurred approximately $85,000 in debt in her name before and after the parties separated, plus an additional $5,000 in medical expenses after November 12, 2008.[4]
The husband was awarded his vehicle (valued at $10,000) and three items of personal property with an unknown value. Because we have determined that the trial court correctly concluded that the husband’s interest in two parcels of land were part of his separate estate, the value of those parcels cannot be considered. See Hull, supra. The husband was ordered to pay the costs of repair to the marital residence and all the indebtedness on the marital residence, which was approximately $395,000. He was also responsible for payment of the $40,000 debt he had accumulated in his name. In addition to the amounts he paid during the pendency of the proceedings, set forth above, the husband was required to obtain a life-insur- *557 anee policy in the amount of $500,000 and to pay one-half of the wife’s monthly health-insurance cost. The husband was further ordered to pay all the child’s uncovered medical expenses, which totaled at least $1,400 a month.[5]
With this award in mind, we will consider the -wife’s argument that she should have been awarded permanent periodic alimony. The wife presented evidence indicating that her monthly budget, excluding items which the husband was ordered to pay or she was ordered to sell, totaled approximately $4,200 a month.[6] The wife’s monthly budget includes approximately $1,580 a month for payment of her unsecured credit-card debt and $225 a month for clothing for her and the child. Including the wife’s child-support award, the wife will receive a total of $4,200 a month in support. However, considering the large cash sums awarded to the wife, it is reasonable to conclude that the wife could use those sums to greatly reduce her credit-card debt and, thus, greatly reduce her monthly living expenses.
The record indicated that the husband’s monthly income, after taxes and other deductions were made, was approximately $6,800 a month. Therefore, after the husband paid the financial obligations due to the wife, he had only $2,600 a month to support himself and to pay the obligations he was required to pay pursuant to the divorce judgment. The husband’s monthly expenses totaled approximately $1,900 a month, without including the costs of paying the mortgage on the marital residence, a life-insurance policy, the child’s uncovered medical expenses, and one-half of the wife’s monthly health-insurance expense.
The wife argues that the 24-month limitation of rehabilitative alimony was insufficient and that she should have been awarded permanent periodic alimony because the evidence indicated that her financial position would not improve in the near future. The wife, in her brief, alleges that she needs three additional years of schooling to obtain a master’s degree so that she can return to work as a speech and language pathologist. However, there is nothing in the record to support the wife’s statement in her brief that it would take three years to obtain her master’s degree or a teaching certificate so that she could return to work. Also, at the November 2008 hearing, the wife testified that she thought it was unlikely that the child would be well enough to attend school within the next several years. However, the record indicated that the parties had attempted to put the child in school before they separated, and, according to both parties, the child’s condition was improving greatly, in large part due to the efforts of the wife, which were, unquestionably, commendable.
‘“This court has defined rehabilitative alimony as “a sub-class of periodic alimony” that allows a spouse “time to reestablish a self-supporting status.” ’ Fowler v. Fowler, 773 So.2d 491, 495 (Ala.Civ.App.2000) (quoting Jeffcoat v. Jeffcoat, 628 So.2d 741, 743 (Ala.Civ.App.1993), overruled on other grounds, Crenshaw v. Crenshaw, 816 So.2d 1046 (Ala.Civ.App.2001)).”
*558 Benson v. Benson, 876 So.2d 1157, 1164 (Ala.Civ.App.2003).
Although the members of this court may have made a different award, we cannot conclude that the trial court exceeded its discretion by awarding the wife rehabilitative alimony for 24 months in light of the fact that the trial court reserved the right to award the wife periodic alimony at the conclusion of the rehabilitative period and considering that the wife was awarded almost all the marital property. See Stone v. Stone, 26 So.3d at 1235-36 (“This court is not permitted to reweigh the evidence on appeal and substitute its judgment for that of the trial court.”). Based on the evidence presented, it is not unreasonable to conclude that 24 months would be a sufficient amount of time to allow the wife to obtain the certification necessary to reenter the workforce, considering the evidence indicating that the child’s condition was improving and that her ability to attend school at some point in the future was foreseeable by both parties. We note, however, that considering the length of the parties’ marriage, the parties’ ages and health, their future prospects, and the disparity in the parties’ income, it was necessary for the trial court to reserve the right to award periodic alimony to the wife in the future.
To the extent that the wife argues that the trial court should have required the husband to pay the full amount of tuition required for her to obtain her master’s degree, we conclude that the trial court did not exceed its discretion by failing to do so because the wife presented no evidence indicating what the husband’s obligation would be. Furthermore, it is unclear how such an obligation would be financed by the husband, who was awarded his vehicle and three items of personal property and ordered to pay several thousand dollars in financial obligations pursuant to the divorce judgment.
IV. The Income-Tax Exemption
Finally, the wife argues that the trial court erred by awarding the husband, the noncustodial parent, the right to claim the income-tax dependency exemption for the child because, in doing so, the trial court failed to make a written finding stating its reasons for deviating from the child-support guidelines. See Rule 32(A)(ii), Ala. R. Jud. Admin.; and Langley v. Langley, 895 So.2d 971, 975 (Ala.Civ.App.2003).
The wife also argues that the trial court exceeded its discretion by awarding the husband the right to claim the income-tax dependency exemption because the trial court was operating under the impression that receipt of rehabilitative alimony was not a “taxable event” for the wife. The wife argued that she, as the custodial parent, should be entitled to claim the income-tax dependency exemption because of her award of rehabilitative alimony, which totaled approximately $32,400 a year. However, the trial court stated that the wife’s income from the receipt of rehabilitative alimony was not taxable income, and the wife stated that she had no other sources of taxable income.
This court has held that periodic alimony “is treated as taxable income to the party receiving the award.” Rose v. Rose, 70 So.3d 429, 433 (Ala.Civ.App.2011) (citing Adkins v. Adkins, 61 So.3d 1071, 1077 (Ala.Civ.App.2010)). Furthermore, we have held that rehabilitative alimony is a subclass of periodic alimony, see Giardina v. Giardina, 987 So.2d 606, 620 (Ala.Civ.App.2008), and that it has the same modifiable characteristics as an award of periodic alimony upon a showing of a change in circumstances, see Treusdell v. Treusdell, 671 So.2d 699, 704 (Ala.Civ.App.1995) (stating that the wife’s rehabilitative-alimony award was “subject to future modification, including extension and increase, *559 upon changed circumstances”). See also Giardina, 987 So.2d at 620 (recognizing that a recipient of rehabilitative alimony has the right to file a petition to modify that award).
In Kelley v. State Department of Revenue, 796 So.2d 1114 (Ala.Civ.App.2000), this court discussed 26 U.S.C. § 215(b) which provides that alimony, as defined in 26 U.S.C. § 71(b), is includible in the gross income of the recipient spouse. Alimony is defined in 26 U.S.C. 71(b), as follows:
“(1) In general. — The term ‘alimony or separate maintenance payment’ means any payment in cash if—
“(A) such payment is received by (or on behalf of) a spouse under a divorce or separation instrument,
“(B) the divorce or separation instrument does not designate such payment as a payment which is not in-cludible in gross income under this section and not allowable as a deduction under section 215,
“(C) in the case of an individual legally separated from his spouse under a decree of divorce or of separate maintenance, the payee spouse and the payor spouse are not members of the same household at the time such payment is made, and “(D) there is no liability to make any such payment for any period after the death of the payee spouse and there is no liability to make any payment (in cash or property) as a substitute for such payments after the death of the payee spouse.”
This definition of alimony applies to an award of alimony in a divorce judgment whether it is labeled periodic alimony or rehabilitative alimony in the divorce judgment. Because rehabilitative alimony, as a subclass of periodic alimony, has the same characteristics as periodic alimony, we conclude that an award of rehabilitative alimony falls within the definition of alimony pursuant to 26 U.S.C. 71(b). Accordingly, we conclude that rehabilitative alimony is taxable as income to the recipient spouse. Because the trial court was operating under the impression that the wife’s substantial award of rehabilitative alimony was not taxable income, we must reverse the judgment insofar as it assigns the income-tax dependency exemption to the husband and remand the cause to the trial court to determine whether, in light of the fact that the wife did have approximately $82,000 a year in taxable income, she should be able to maintain the income-tax dependency exemption as the custodial parent.[7]

Conclusion

The judgment of the trial court, insofar as it set forth the husband’s visitation rights, divided the parties’ property, and awarded the wife rehabilitative alimony, is affirmed. The judgment, insofar as it assigned the income-tax dependency exemption to the husband, is reversed, and the cause is remanded for proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.

. There is an indication in the record that, after the sale of part of the tract of land that the husband had inherited an interest in from his father, his one-quarter interest in 20 acres was all that remained of his inheritance from his father.

. Pursuant to the trial court’s "Schedule A” visitation schedule, the husband was awarded visitation with the child on alternating weekends. Due to the child’s medical appointments of Friday afternoons, the husband’s visitation period began at 11:00 a.m. on Saturday and ended at 6:00 p.m. on Sunday.

. We note that the citation in the wife’s brief on appeal to testimony in the record that allegedly supports her statement in the brief that the proceeds from the sale of the timber "were deposited in the parties’ joint account and used for normal living expenses and payment of household bills,” is misleading, at *556 best. The testimony cited by the wife is as follows:
“Q. [The wife’s attorney]: Well, did you make money off of a timber cutting?
"A. [The husband]: Yeah. We made money. This was about eight years ago.”
Such testimony hardly constitutes evidence indicating that the husband deposited proceeds from the sale of the timber into a joint account that was used for normal expenses and payment of household bills, as the wife alleges.

. The record is unclear as to how the wife accumulated such a large amount of debt, allegedly before and after the parties separated, because the record indicated that the parties used $54,000 from the proceeds of the sale of part of the husband's separate property to pay off the parties’ bills shortly before the parties separated.

. We determined this amount by calculating the cost of the child's weekly hyperbaric treatments ($100 per hyperbaric treatment, 3 hy-perbaric treatments per week = approximately $1,200 a month) plus an additional $200 a month for the child’s vitamins and medications.

. This total does not include a monthly cost for a home. However, it does include $885 in monthly payments toward utility bills and costs associated with the marital residence (such as yard maintenance, home maintenance, and an alarm system) that could be used as a payment toward renting a home.

. Because we are reversing the judgment insofar as it assigns the income-tax dependency exemption to the husband and are remanding the cause, we will not address the wife’s argument on appeal that the trial court failed to comply with Rule 32(A)(ii). However, we stress that this court has, in previous cases, strictly enforced the provisions of Rule 32(A)(ii).